# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-02134-COA

**MAEGAN WHITE A/K/A MEAGAN WHITE**　　　　　　　**APPELLANT**
**A/K/A MAEGAN LEE WHITE**

**v.**

**CHRISTOPHER WHITE A/K/A CHRISTOPHER**　　　　　　**APPELLEE**
**LEE WHITE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/12/2013 |
| TRIAL JUDGE: | HON. DOROTHY WINSTON COLOM |
| COURT FROM WHICH APPEALED: | WEBSTER COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ROBBIE E. WILLIS |
| | JAMES P. VANCE |
| ATTORNEY FOR APPELLEE: | CARRIE A. JOURDAN |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| TRIAL COURT DISPOSITION: | CUSTODY OF MINOR CHILDREN AWARDED TO APPELLEE |
| DISPOSITION: | AFFIRMED - 06/16/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., ROBERTS AND JAMES, JJ.**

**ROBERTS, J., FOR THE COURT:**

¶1.　The Webster County Chancery Court granted Maegan Lee White ("Maegan") and Christopher Lee White ("C.L.") an irreconcilable-differences divorce. The parties submitted all child-related issues to the court, including child custody and visitation. The court awarded C.L. sole custody of their two minor children and gave Maegan visitation rights. Maegan timely appealed. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.　Maegan and C.L. married on July 1, 2006, in Starkville, Mississippi. Their son,

Garrett, was born on January 13, 2007. The couple's daughter, Harley, was born December 26, 2007. Maegan filed for divorce on February 21, 2012, on the grounds of habitual cruel and inhuman treatment, or in the alternative, irreconcilable differences. She also sought permanent custody of Garrett and Harley. C.L. filed his answer and a counter-complaint for divorce on May 9, 2012, citing adultery, habitual cruel and inhuman treatment, or in the alternative, irreconcilable differences. He also sought permanent custody of the two children. A temporary order was entered on June 4, 2012, granting Maegan temporary custody of the children and awarding C.L. visitation every other weekend.

¶3.     On or about September 11, 2012, Maegan filed a motion to suspend visitation, alleging that C.L. had inappropriately touched Harley. As a result, the chancellor suspended C.L.'s visitation and appointed a guardian ad litem (GAL) to investigate. Once the GAL filed her report, C.L. filed a motion to reinstate visitation on October 12, 2012. On November 20, 2012, the chancellor reinstated C.L.'s visitation but ordered that all visits be supervised by the Webster County Department of Human Services. In April 2013, the court reinstated C.L.'s full visitation rights. Thereafter, on April 2, 2013, the parties consented, in writing, to a divorce on the ground of irreconcilable differences, submitting the following issues to the court: child custody and visitation, child support, children's health insurance and health-related bills, children's school and extracurricular expenses, claiming the children on tax returns, all other child-related matters, division of personal property, and taxes. A trial was held June 18-19, 2013.

¶4.     At trial, the following facts were presented: Maegan is twenty-eight years old and has

2

been a registered nurse since 2007. She earned her nursing degree while married to C.L. Maegan has worked with five different companies in various capacities since beginning her career. C.L. is forty years old and owns a body shop next door to the marital home. Until the separation, Maegan, C.L., and their two children lived together in Webster County. C.L. worked at his body shop for the entirety of the marriage, while Maegan had to travel from Webster County in order to attend school and later for work. While both parties were at school or work, Maegan's family members often helped watch the children until May 2008, when both children began attending daycare. While C.L.'s job was consistently near the home and provided "normal" working hours, Maegan's career as a nurse sometimes required her to work night shifts and required significant travel. During this time, parenting duties were equal, although sometimes aided by Maegan's family members.

¶5.    When the parties separated in June 2011, Maegan moved with the children to Oktibbeha County, which was near to her mother and her job at Mississippi Home Care in Starkville. Initially, C.L. and Maegan split equal time with the children, rotating every two days as well as three-day weekends. In August 2011, Maegan enrolled Garrett and Harley in preschool in Louisville, which was approximately fifteen minutes from their home in Sturgis. The children adjusted well to their new school, and Harley began speech therapy. In February 2012, Maegan moved, along with the children, to Caledonia. Here, Maegan enrolled the children in a pre-kindergarten program at Caledonia Elementary. In June 2012, the court awarded Maegan temporary full custody and gave C.L. visitation rights for every other weekend and the month of July 2012.

¶6.     In August 2012, Maegan filed an emergency motion with the court, alleging that C.L. had inappropriately touched Harley.  Maegan testified at trial that in August 2012, when the children returned after a visit with C.L., Maegan discovered blood in Harley's underwear and an abscess on her upper thigh. Two weeks later, Harley had a "fit" when she had to return to C.L.'s, including becoming physically ill, screaming, and crying.  Soon after, Harley allegedly disclosed to Maegan that C.L. had inappropriately touched her.  After Maegan filed her emergency motion presenting these allegations, the court revoked C.L.'s visitation rights and an investigation commenced.  Harley was interviewed by police, by the Lowndes County Department of Human Services, and the court-appointed GAL.  The GAL's report later stated that Harley had told the GAL that her mother told her she could avoid returning to C.L.'s if she told people he had touched her private parts.  Maegan denied this at trial.  The allegations against C.L. were found to be unsubstantiated, and his visitation rights were restored.

¶7.     In December 2012, Maegan resigned from her job and moved from Caledonia back to Sturgis.  She began a new job at Rolling Hills, a healthcare facility in Starkville, and the children were enrolled at the Louisville Public Schools.  Roughly two months after beginning employment with Rolling Hills, Maegan began working at Diamond Grove in Louisville. Two weeks after being hired, Maegan was terminated.  She testified at trial it was because her drug screen tested positive for Adderall, and although she had a prescription, the facility said they could not take a risk of having an employee with access to amphetamines at their facility, where many patients had the same type of medicine.  At the time of trial, Maegan had secured employment as a home health nurse in Louisville.  Maegan testified that the

4

children, regardless of where they were living or where their mother worked, had a schedule that they adhered to. If she was ever "on call," there were always friends or family members nearby who would be able to temporarily care for the children.

¶8. Additionally, Maegan testified generally that she and the children attended church regularly, and that she did not consume alcohol regularly or abuse drugs. She denied that anyone who cared for her children drank to excess or had any problems with alcohol. She also denied dating anyone during her marriage and denied having sexual relationships with anyone in front of her children. Maegan claimed that both prior to and after the separation, C.L. neglected Harley. She testified that he often took Garrett hunting and fishing, but left Harley at home. Even when both children were home, he had little to do with Harley. Maegan's mother and grandmother both testified similarly about C.L.'s involvement with Harley. Both women also testified about Maegan's parenting skills and their willingness to help care for the children whenever needed.

¶9. Additional witnesses were called to testify about Maegan, including Taryn Shurden, a friend and coworker. Shurden's testimony called into question the veracity of Maegan's statements that she did not drink or date during or after the separation. Shurden testified that she had seen Maegan drink alcohol socially and said it would be untrue for someone to say she never drank. Shurden also testified that she did not believe Maegan to have a problem with alcohol; however, Maegan had confided concerns about her own mother's drinking. Finally, Shurden testified that she knew of two prior relationships Maegan had both during the marriage and after the separation. Jimmy Owens, the human-resources director at

5

Diamond Grove, where Maegan worked for a very brief time, also testified. Owens denied Maegan's account of her time at Diamond Grove. He stated that after Maegan's drug screen came back positive for amphetamines, he tried to get in touch with her about providing a valid prescription. She was unable or unwilling to do so and never contacted him again. She was ultimately terminated for absenteeism.

¶10. C.L.'s testimony obviously differed in many respects from Maegan's. He testified that he had lived in the marital home prior to the marriage, and he still lived there post-separation. His business had been continuously located less than a mile away from his home, and he worked there generally from 8 a.m. to 5 p.m., Monday through Friday. C.L. stated that he had owned this business since 1999, and because he was the boss, he had flexibility to come and go as needed. C.L. admitted, like Maegan, that they shared parenting responsibilities while married, but denied that she did the bulk of the work and that he neglected Harley. C.L. did not deny that Maegan, as an offshoot of her career as a nurse, was primarily responsible and more knowledgeable about the children's heath needs. C.L. testified that he had a wonderful relationship with both children, and he showed no favoritism to Garrett because he was a boy. C.L. admitted he took Garrett hunting and fishing more often than Harley, but only because Garrett was a boy and was older. C.L. noted that both children had some confusion over the separation at first, but that even despite the allegations made against him, he still had a healthy relationship with both children.

¶11. C.L. testified that he planned to stay in his current home for the foreseeable future. He said that both children would be able to be enrolled in Webster County schools, should

he be given custody, and they could remain there until they graduated from high school. Despite the problems between him and Maegan, C.L. said he would be more than happy to have Maegan involved in the children's school life and extracurricular activities. Contrary to Maegan's testimony, C.L. denied refusing to participate in Harley's speech therapy. He testified that he did not really know that she was in speech therapy, and he did not believe it was necessary. However, he did notice a marked improvement in her speech and would continue to assist in therapy as needed. C.L. acknowledged that his family was not as involved with the children as Maegan's was, but he appreciated the help her family was able to provide.

¶12. C.L. testified that he was, at the time of trial, in a relationship with a woman named Jennifer Smith. He said that he sometimes spent the night with Jennifer when he did not have visitation with his children, but that Jennifer had never stayed at his home when Garrett and Harley were there. Smith testified similarly. C.L. testified that he did not want to push his children into his new relationship with Smith, and he felt it was important for them not to see him stay with Smith because he was still married to their mother. C.L. testified about the importance of morals and stability for his children, both of which he believed he could provide.

¶13. The final witness testimony came from the GAL, who had already submitted her report to the court. In her report and her testimony, the GAL recommended that custody be given to C.L., based off the stability he could provide to the children. She did not note any specific detrimental effects on Garrett and Hartley from the multiple moves they had endured

7

since the separation, but she did believe that switching schools could be difficult for children. She mentioned that her opinion of C.L.'s stability and truthfulness had strengthened during the trial. However, the GAL's opinion of Maegan's truthfulness somewhat declined during her investigation and the trial. Specifically, the GAL testified that she believed the molestation allegations were created by Maegan to further her cause for full custody. Her report was admitted as an exhibit. In her final recommendation, the GAL noted:

> The Court is confronted with the dilemma in which two loving, capable parents both want custody of their minor children. The father offers more stability to the children. . . . Maegan, on the other hand, has not exhibited much stability. . . . I believe it is in the best interest of the children to stay in one area and develop a home community, which seems to have already been established in Mathiston.

> Maegan and C.L. both have great parenting skills. . . . Garrett and Harley would be in good hands with either parent. However, I believe that the [f]ather offers the most stability to the children and it would be in their best interest if their physical custody was placed with him.

¶14. The chancellor ultimately agreed with the GAL. In her order, the chancellor weighed the *Albright* factors, keeping in mind the polestar consideration of the best interest of the children. She found four factors to be in C.L.'s favor; one in Maegan's favor; two in neither parent's favor; and four to be in both parents' favor.[1] The court also noted that it questioned Maegan's credibility, as she was untruthful about dating other people and the termination of her job at Diamond Grove. The chancellor was unable to ignore the false allegations of molestation made against C.L., noting that Harley told the GAL that Maegan told her to say her father had touched her. Finally, the chancellor noted that all of these circumstances—the

---

[1] In her opinion, the chancellor did not address the preferences of the children, finding them to be inapplicable. Neither party challenges this finding.

8

*Albright* factors, the credibility of the witnesses, and the GAL's report—led her to find that C.L. should be awarded custody of Garrett and Harley.

¶15.    Maegan timely appealed and raised two issues:

  I.    Whether the chancellor is required to consider the propriety of joint custody    in an irreconcilable-differences divorce where neither party requests joint custody.

  II.    Whether the chancellor erred in her application of the *Albright* factors.

**STANDARD OF REVIEW**

¶16.    "[T]he standard of review in child[-]custody cases is quite limited. A chancellor must be manifestly wrong [or] clearly erroneous, or apply an erroneous legal standard in order for [the appellate court] to reverse." *Johnson v. Gray*, 859 So. 2d 1006, 1012 (¶31) (Miss. 2003) (citing *Mabus v. Mabus*, 847 so 2d 815, 818 (¶8) (Miss. 2003)). We defer to a chancellor's findings of fact; however, her conclusions about the law are reviewed de novo. *Irving v. Irving*, 67 So. 3d 776, 778 (¶11) (Miss. 2011).

¶17.    Additionally, our polestar consideration in child-custody cases must be the best interest of the child. *Hall v. Hall*, 134 So. 3d 822, 825 (¶8) (Miss. Ct. App. 2014). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004) (citing *Bower v. Bower*, 758 So. 2d 405, 412 (¶33) (Miss. 2000)).

**ANALYSIS**

9

## I. Joint-Custody Requirement

¶18. Maegan argues that the chancellor failed to consider joint custody at all in her decison to grant C.L. custody of Garrett and Harley, and this failure is "manifestly wrong, clearly erroneous, and . . . based on an erroneous legal standard." Maegan cites *Crider v. Crider*, 904 So. 2d 142 (Miss. 2005), and *Clark v. Clark*, 126 So. 3d 122 (Miss. Ct. App. 2013), arguing that these cases *require* a chancellor to consider joint custody, even when neither party has asked the court to consider joint custody. Maegan argues that because she and C.L. both applied to the court for a determination of custody issues, the Mississippi Supreme Court's interpretation of the phrase "upon application of both parties" in *Crider* requires the court to consider whether joint custody is in the best interest of the children. We cannot agree.

¶19. Maegan's interpretation of both *Clark* and *Crider* is faulty. In *Clark*, this Court reversed and remanded a chancellor's decision to award sole physical custody to the mother, requiring the court to consider the propriety of joint custody on remand. Both parents had requested sole physical custody of their child and submitted the issue to the court for determination. After hearing testimony of the parties, the chancellor had noted: "[In these] kinds of cases . . . it's hard . . . to give the child to one or the other because everything here would support that. . . . *[H]ow can you choose one over the other, but [this court] has to.*" *Clark*, 126 So. 3d at 124-25 (¶10). In reversing the chancery court's judgment, this Court noted, "Based on our reading of the transcript, it appears that the chancery court may have concluded . . . that it was required to order custody to one parent regardless of whether joint

10

physical custody was in the best interest of [the child]." *Id.* at 125 (¶12). Noting our concern that the chancery court had incorrectly concluded it was not authorized to consider joint custody, as neither party had requested it, we reversed and remanded for further consideration.

¶20. Similarly, in *Crider*, parents in an irreconcilable-differences divorce each requested sole custody of their child. The parents submitted the issue of custody to the court for determination. After considering testimony presented and conducting an *Albright* analysis, the chancellor found that, even though neither parent requested joint custody, it was in the child's best interest. Thus, she awarded joint custody to the parents for a two-year period. The mother appealed, noting that Mississippi Code Annotated section 93-5-24(2) (Rev. 2013)[2] prohibited a chancellor from awarding joint custody unless specifically requested by the parties. This Court agreed and reversed the chancellor's judgment, prompting the father to petition for certiorari with the supreme court. After a thorough analysis of the statute and its meaning, the supreme court stated:

> It is logical and reasonable that "application of both parties" exists when both parties consent to allowing the court to determine custody. The fact that the parties request that the court determine which parent is to receive "primary custody" does not alter this. The parties are allowing the court to determine what form of custody is in the best interest of the child. If joint custody is determined to be in the best interest of the child using court-specified factors, i.e., the *Albright* factors, the parties should not be able to prohibit this by the wording of the consent.

*Crider*, 904 So. 2d at 147 (¶12). The supreme court further noted that the chancellor is in the

---

[2] Section 93-5-24(2) reads: "Joint custody may be awarded where irreconcilable differences is the ground for divorce, in the discretion of the court, upon application of both parents."

11

best position to evaluate the "credibility, sincerity, capabilities and intentions of the parties," and that it is "incumbent upon a chancellor not to award joint custody" unless in the best interest of the child. *Id.* at (¶13). The court ultimately held that "when parties consent in writing to the court's determination of custody, they are consenting and agreeing to that determination and this meets the statutory directive of 'joint application' in [section] 93-5-24(2)." *Id.* at 148 (¶15). Finally, the court affirmed the chancellor's judgment and noted that a "chancellor *may* award joint custody in an [irreconcilable-differences] divorce, when the parties request the court to determine custody." *Id.* at 148-49 (¶17) (emphasis added).

¶21. Maegan incorrectly interprets both *Clark* and *Crider* to require a chancellor to consider joint custody when faced with an irreconcilable-differences divorce. The chancellor "is bound to consider the child's best interest above all else." *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996). In both *Clark* and *Crider*, the chancellors found joint custody to be in the child's best interest. In *Clark*, the chancellor incorrectly awarded sole custody to one parent despite the finding that joint custody was the child's best interest; in *Crider*, the chancellor awarded joint custody because that was in the child's best interest, and the supreme court affirmed that award. *Crider* and its progeny allow—not require—a chancellor to award joint custody when in the best interest of the child. In the present case, the chancellor found that it was in Garrett and Harley's best interest to give custody to C.L. Though the chancellor's order makes no mention of joint custody, he is not required to do so. The chancellor's primary duty is to consider the best interests of the children and make

12

a determination of custody based on that concern. There is no evidence that the chancellor disregarded the children's best interests when determining custody. The chancellor's custody award to C.L. was not error.

## II. *Albright* Analysis

¶22. The polestar consideration in child-custody cases is the best interest of the child. *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). The *Albright* factors are as follows: (1) age, health, and sex of the child; (2) a determination of the parent who had the continuity of care prior to the separation; (3) which parent has the best parenting skills and which parent has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) the physical and mental health and age of the parents; (6) the emotional ties of parent and child; (7) the moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) the stability of the home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. *Id.*

¶23. "In order to determine whether or not the chancellor was manifestly wrong, clearly erroneous or abused his discretion in applying the *Albright* factors, we review the evidence and testimony presented at trial under each factor to ensure his ruling was supported by the record." *Hollon v. Hollon*, 784 So. 2d 943, 947 (¶13) (Miss. 2001). However, analysis under *Albright* is "not a mathematical equation." *Hall*, 134 So. 3d at 827 (¶19) (citing *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001)). Additionally, "all the [*Albright*] factors are

13

important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson*, 859 So. 2d at 1013-14 (¶36). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Hammers*, 890 So. 2d at 950 (¶14) (citing *Bower*, 758 So. 2d at 412 (¶33)). The Court must defer to the chancellor's findings under *Albright* if they are supported by substantial evidence and cannot reweigh the importance of the evidence. *Hall*, 134 So. 3d at 828 (¶21) (citing *Carter v. Carter*, 735 So. 2d 1109, 1114 (¶18) (Miss. Ct. App. 1999)).

¶24. Maegan alleges that the chancellor's findings under *Albright* were clearly erroneous "because substantial, credible evidence supported alternative findings that would favor either Maegan or both parents[.]" Of the eleven factors the chancellor considered, Maegan claims the chancellor erred in her analysis of nine factors. The chancellor found that four factors favored C.L.; one factor favored Maegan; four factors favored both parents; and two factors favored neither parent. After thoroughly reviewing the record, including the parties' briefs,[3]

---

[3] C.L.'s brief to the Court barely addresses the *Albright* factors or Maegan's claims, other than to assert that the chancellor's findings of fact should be given deference. The entirety of C.L.'s argument in support of the chancellor's findings scarcely covers a page. In her reply brief, Maegan urges the Court to hold that C.L. has waived his argument as to the merits of the case because he failed to completely brief his argument and cited only basic principles of law. We decline to do so; moreover, in *N.E. v. L.H.*, this Court noted that "when matters on appeal touch the welfare of a minor child, then regardless of whether a party filed a brief, [we] will 'reach the merits of the issues in [the] appeal.'" *N.E. v. L.H.*, 761 So. 2d 956, 962 (¶14) (Miss. Ct. App. 2000) (quoting *Allred v. Allred*, 735 So. 2d 1064 (¶9) (Miss. Ct. App. 1999)). Though his argument is brief, C.L. did file a responsive brief and did cite support for his factual argument. Although we generally desire parties' briefs to provide an in-depth, yet concise, analysis, C.L.'s brief does not amount to a waiver.

14

the trial transcript, and other documents, we cannot say the chancellor's decision to award custody to C.L. was manifestly wrong or clearly erroneous.

### A.     The Age, Health, and Sex of the Child

¶25.    Maegan claims that the chancellor erred in her finding that "the age of the children favors neither parent" because the chancellor failed to analyze or explain that finding. She points to this Court's holding in *Fulk v. Fulk*, 827 So. 2d 736 (Miss. Ct. App. 2002), to support her argument that the chancellor's brief statement on the age of the children is insufficient. In *Fulk*, this Court reversed and remanded a chancellor's award of custody to the father. The chancellor in that case issued a bench ruling and did not consider all of the *Albright* factors. Additionally, all of the factors she did examine were in the father's favor, and the chancellor offered no explanation as to how she arrived at her conclusions. We remanded for her failure to discuss and consider each factor. *Id.* at 740 (¶13).

¶26.    The present case significantly differs from *Fulk*. In the present case, the chancellor did discuss each of the *Albright* factors. The chancellor provided some explanation for each factor with the exception of the age of the children. The chancellor found that the children's ages favored neither parent, and she provided no discussion about her finding. However, this

Furthermore, the cases Maegan cites to in support of her request both involved the *appellant's* failure to provide authority in support of his arguments. *See Jefferson v. State*, 138 So. 3d 263, 265 (¶8) (Miss. Ct. App. 2014); *Taylor v. Kennedy*, 914 So. 2d 1260, 1262 (¶¶3-4) (Miss. Ct. App. 2005).

Additionally, though C.L.'s brief only briefly discusses the application of the *Albright* factors, the bulk of his brief is dedicated to the argument that Maegan waived any error by not filing a post-trial motion to the chancellor. C.L. cites Mississippi Rule of Civil Procedure 59(e) to support his argument. Rule 59 is inapplicable here. The chancellor's judgment is final and appealable; there is no requirement for post-judgment motions.

one instance alone is not sufficient to rule that the chancellor's analysis was manifestly erroneous. In *Fulk*, the chancellor did not discuss several factors at all, and the factors she did discuss were supported by no explanation or rationale. It was necessary for this Court to reverse and remand in *Fulk* as we could not review the chancellor's analysis where it did not exist. Here, the chancellor has provided analysis. It is true that some factors received more analysis than others, but some factors required more discussion.

¶27.    However, Maegan claims that the age factor required a discussion of the tender-years doctrine. She argues that the doctrine, though weakened, still gives a presumption that a mother is generally better suited to raise a young child.[4] At the time of trial, Garrett was six and Harley was five. The supreme court has ruled that "a child is no longer of tender years when that child can be equally cared for by persons other than the mother." *Mercier v. Mercier*, 717 So. 2d 304, 307 (¶15) (Miss. 1998). While the tender-years doctrine was once often determinative of custody issues, it is now only a presumption and one of several factors to be considered. *Id.* Sufficient evidence was produced at trial to show that both parents were equally capable of caring for both children. We cannot say that the chancellor's finding regarding age or her failure to address the tender-age doctrine was manifestly erroneous.

¶28.    Maegan does not dispute the chancellor's findings that Garrett's sex favored C.L. and Harley's sex favored Maegan. She does dispute, however, that Garrett's health weighs in C.L.'s favor. Much evidence was presented at trial regarding Maegan's career as a nurse, Harley's medical issues, and Garrett's allergies. Both parents testified and were cross-

---

[4] *Sobieske v. Preslar*, 755 So. 2d 410, 413 (¶10) (Miss. 2000).

examined on these issues. Though C.L. testified that during the marriage, Maegan took care of the majority of the children's healthcare due to her career, he testified he was fully able to care for their health needs alone. He was questioned regarding Harley's dog bite and the treatment it received. He was also questioned regarding Garrett's allergy to peanuts. The chancellor is in the best position to hear testimony and weigh its credibility. We will not disturb the chancellor's findings where there is sufficient evidence to support her findings. *Hall*, 134 So. 3d at 828 (¶21).

### B. Continuity of Care

¶29. Maegan claims the chancellor's finding that continuity of care favored both parents was erroneous. In her opinion, the chancellor noted that Maegan was the primary caretaker prior to the separation but that C.L. was the sole caretaker of the children when Maegan worked nights. Maegan does not dispute that C.L. has been continually involved in the care of the children. Maegan claims that even post-separation, she was the primary caretaker, as she took the children to school, got them ready for school, and bathed them—even when C.L. had them on school nights. However, C.L. disputed Maegan's testimony regarding her role as sole caretaker. He testified that the parenting duties were split fairly evenly pre-separation. He denied that the children were ever unclean or dirty when he returned them to Maegan's care. We find no manifest error with the chancellor's findings. We will not disturb her findings where sufficient evidence exists in support of those findings. *Id.*

### C. Parenting Skills

¶30. Maegan does not dispute the chancellor's finding that the parenting skills favor her.

17

However, she does claim this factor should be given more weight than any other. She offers no support for this theory. We decline to afford the parenting-skills factor more weight than other *Albright* factors.

### D. Willingness and Capacity to Provide Primary Care

¶31. The chancellor found that both parents were willing and able to provide primary care for Garrett and Harley. Maegan argues that the chancellor erred because she is *more* capable and willing than C.L. Maegan's argument seems to hinge on her dedication to the children's healthcare and her dedication to have the children enrolled in preschool programs and educational day care. However, C.L. testified that those things were important to him as well. According to his testimony, his objection to the children's enrollment at a preschool was not because he objected to preschool; he objected to moving the children around from school to school. Again, we decline to substitute our judgment and weighing of the evidence for the chancellor's. *Hall*, 134 So. 3d at 828 (¶21).

### E. Employment of Each Parent and the Responsibilities of that Employment

¶32. The chancellor found that Maegan's employment required her to rely on family members and friends to care for the children, whereas C.L.'s job is more flexible, ultimately favoring him. Both parents and several witnesses testified about Maegan's reliance upon her mother, grandmother, and friends to help watch the children and even pick them up from school. C.L. testified that, should he be given custody, the children's school would be less than a mile from his home and place of business. He planned to keep his job and his home at least long enough for both to graduate high school. On the other hand, Maegan's

employment had been unsteady since graduating from nursing school. She had held several jobs, in several locations, since the separation. A few of those jobs also involved extensive travel and the need to be "on call" and available at a moment's notice—even in the middle of the night. Maegan claims the chancellor's finding this factor in C.L.'s favor was error when this factor favors both parties. However, we find no error. We will not disturb the chancellor's findings where there is sufficient evidence to support them. *Hall*, 134 So. 3d at 828 (¶21).

### F. Physical and Mental Health of Each Parent

¶33. Neither party disputes the finding that this factor favored both parents.

### G. Emotional Ties Between Parent and Child

¶34. The chancellor found that this factor favored neither parent, stating specifically: "Both parents have strong emotional ties with the children. However, not surprisingly, Garrett is closer to [C.L.] and Harley is closer to [Maegan]." Maegan does not dispute that statement but instead argues that the chancellor should have found this factor to favor both parents. She cites *Lee*, 798 So. 2d 1284, to support her assertion that, "[u]nless there is some clear advantage to favoring one parent over the other, the fact that one child is closer to one parent does not preclude a finding that each parent had a strong and binding emotional tie with both children." There is nothing in *Lee* to directly support this theory; however, simply because the chancellor is not precluded from making a certain finding does not mean she is required to make that finding. We find no error with the chancellor's findings.

### H. Moral Fitness of Each Parent

19

¶35. Maegan argues that the chancellor erred in finding this factor to slightly favor C.L. Testimony was presented that Maegan engaged in at least two extramarital relationships during her marriage and had engaged in a few relationships post-separation. Maegan denies these to be "relationships," and says that they would be isolated incidents, should they be true. C.L. did admit to a relationship after the separation, however. The chancellor noted that C.L. did not spend the night with his partner when he had custody of the children, whereas testimony suggested that Maegan had entertained overnight guests while the children were present.

¶36. Maegan correctly asserts that marital fault should not be used as a sanction in custody cases. *Albright*, 437 So. 2d at 1005. However, adultery is a factor to be considered in evaluating moral fitness, though not given "undue weight." *Blakely v. Blakely*, 88 So. 3d 798, 804-05 (¶26) (Miss. Ct. App. 2012). There is no evidence that Maegan was apportioned any "fault" as a result of her alleged relationships. There is also no evidence that the chancellor gave Maegan's alleged adultery any undue weight. We will not disturb the chancellor's findings, as she is in the best position to give weight to the evidence presented to her. *Hall*, 134 So. 3d at 828 (¶21).

### I. Home, School, and Community Record of the Children

¶37. The chancellor found this factor to favor C.L. She noted that though the children had attended several schools, they did not have a true "school record." She also pointed out that the children had been "uprooted" and moved to a different school in the middle of the year. She further noted the fact that while in the Lowndes County School System, Garrett had

20

eleven unexcused absences and six unexcused tardies. Additionally, the chancellor noted that Maegan had to rely on others to pick up the children while she worked. Conversely, if the children were with C.L., they would be at the same school probably for the rest of their school-aged lives, and they would be much nearer their schools, making it easier on the children to arrive on time and not have to wake so early.

¶38. Maegan argues that the chancellor erred by stating that the children had no school record. This is of no consequence. Maegan's argument against that statement centers on her admirable insistence pre- and post-separation that the children attend schools. No one disputes Maegan's dedication to her children's education. The fact that the chancellor correctly or incorrectly stated the children had no school record does not reflect a reversible error on the chancellor's part. She sufficiently noted other evidence to support her finding.

¶39. Maegan further disputes the chancellor's findings that it would be easier on the children to attend school if they lived with C.L. She claims the chancellor's findings were unsubstantiated and thus were error. She argues that the children rose early for school because they liked to get there early for breakfast and to socialize. She also argues that her mother took the children to and from school because her mother worked there, not because Maegan was unable to do it. However, the chancellor's findings also noted that Garrett had had an excessive number of tardies and absences from at least one of his schools. It is not unreasonable for the chancellor to presume that the tardies stemmed from the distance Maegan had to travel to get the children ready for school; by giving custody to C.L., who lived mere minutes from the school, it would benefit the children.

**J. Stability of Home Environment and Employment of Each Parent**

¶40. The chancellor found this factor to favor C.L., noting that Maegan "has moved with the children several times since the separation. In addition, she changed employment for various reasons at least three times since the separation." Maegan argues that the chancellor did not provide sufficient rationale and explanation for her finding that C.L. has proven he can provide a stable home and has stable employment. She also claims that she presented reasons for her moves and changes in employment at trial, and these reasons were always for the benefit of her children. Additionally, Maegan states that, at the time of trial, she had stable and reliable employment, and the chancellor should not have given so much weight to her past employment.

¶41. Maegan argues that the chancellor's statement that C.L.'s home and employment is stable is "conclusory" and unsupported, but evidence presented at trial clearly supports such a conclusion. C.L. has had the same employment since before they married; Maegan has had several different jobs since the separation. Though Maegan argues passionately that her moves and changes in employment were all for the benefit of the children, which no one denies, it does not change the fact that her employment and home have not been as stable as C.L.'s. Thus, sufficient evidence existed for the chancellor to make her finding.

**K. Other Factors Relevant to the Parent-Child Relationship**

¶42. In considering other relevant factors, the chancellor noted an incident where Maegan admitted to leaving the children unattended in her car while she applied for a job. Though Maegan protests that she was watching the car the entire time and the air conditioner was

22

running, the children were frightened enough to call 911 while locked in the car. The chancellor also stated that she "can not [sic] overlook the false allegations made by [Maegan] regarding [C.L.] inappropriately touching Harley." The chancellor stated that she questioned Maegan's credibility, noting that she had doubts about Maegan's testimony regarding other relationships and her employment with Diamond Grove. Finally, the chancellor noted that the GAL found that giving C.L. custody would be in the best interests of the children.

¶43. Maegan does not dispute that leaving the children in the car was poor judgment, but she argues that the chancellor should have factored C.L.'s poor judgment in the *Albright* analysis as well. Maegan also argues that because the chancellor made no finding that the allegations against C.L. were knowingly false, she should have considered the totality of the circumstances surrounding the allegations. Maegan further claims that the chancellor had found the allegations to be a "dead point" because the court ordered that no one other than the GAL be allowed to discuss them. Thus, Maegan alleges, the chancellor's reliance on the GAL's statements regarding the allegations is reversible error. She presents no support for this theory, and we decline to afford it any merit.

### L. Summary of *Albright* Analysis

¶44. Based on the testimony presented at trial and the GAL's report, the chancellor was convinced that it would be in Garrett and Harley's best interest to be placed in C.L.'s custody. After a thorough review of the record, we find the chancellor's decision supported by substantial evidence. Maegan's contention that the chancellor erred in her *Albright* analysis is without merit.

**CONCLUSION**

¶45.    Maegan's claim that the chancellor erred by not considering joint custody is without merit. Similarly, Maegan's assertion that the chancellor's *Albright* analysis was flawed also lacks merit. Substantial evidence existed to support the chancellor's determinations, and we cannot say her decision was manifestly wrong or clearly erroneous. We therefore affirm.

¶46.    **THE JUDGMENT OF THE CHANCERY COURT OF WEBSTER COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**