# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01902-COA

TABATHA KALMON                                                  APPELLANT

v.

BRENT KALMON                                                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/15/2015 |
| TRIAL JUDGE: | HON. DOROTHY WINSTON COLOM |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN PATRICK ROBBINS |
| ATTORNEY FOR APPELLEE: | WILLIAM PAUL STARKS II |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | APPELLEE GRANTED PHYSICAL CUSTODY OF MINOR CHILD, AND APPELLANT ORDERED TO PAY $447 IN MONTHLY CHILD SUPPORT |
| DISPOSITION: | AFFIRMED - 06/27/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., BARNES, CARLTON AND WESTBROOKS, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.     Tabatha and Brent Kalmon were married on April 10, 2010, in Dover, Delaware. The couple had one child, a son, born in August 2011. In October 2012, Tabatha admitted to Brent that she had a brief affair with someone she met while attending physical therapy technical school in San Antonio, Texas, for four months.[1] The Kalmons stayed together, attempting to make the marriage work. However, after Tabatha turned twenty-one years of

---

[1] Tabatha is a member of the United States Air Force. The couple was living in Washington, D.C., at the time.

age, she began "going out" with friends more often, and the couple continued to have marital problems. The Kalmons moved to Lowndes County, Mississippi, in January 2013 when Tabatha was assigned to the Columbus Air Force Base. The couple separated on August 16, 2013. Brent discovered afterwards that Tabatha had sent her former paramour, Jonathon Crane, a text in April 2013; she also sent Jonathon nude photographs.

¶2. On November 2, 2013, after Brent had denied her late-night request to pick up their two-year-old child, Tabatha took an overdose of sleep medication (four Ambien and three Flexeril pills). Although Tabatha claimed she had no intention of killing herself, she was hospitalized for two days and received mandatory mental-health counseling for several months (November 2013–September 2014). She was also prescribed medication for depression. She continued to be employed full-time on active duty.

## SUMMARY OF PROCEEDINGS

¶3. On November 7, 2013, Brent filed a complaint for divorce and other relief, seeking a divorce based on adultery and habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. He also requested sole legal and physical custody of their minor child. Tabatha filed an answer and counterclaim for divorce. The Lowndes County Chancery Court entered a temporary order on December 2, 2013, awarding the couple joint physical and legal custody of the minor child during the pendency of the proceeding.

¶4. On October 7, 2014, Brent filed an emergency motion for a change of custody, alleging Tabatha "ha[d] exhibited a complete disregard for the safety and well-being" of the child by failing to require their son to use a child-safety seat and by driving while texting

2

when the child was present in the car. The motion also charged that, during this incident, Tabatha's mother used profanity in front of the child and engaged in "teaching and coaching" the child to use profanity. The chancellor denied the motion.

¶5.    A trial was held April 15, 2015, and continued on August 4, 2015. On April 15, 2015, the parties withdrew all fault-based grounds and consented to a divorce based on irreconcilable differences. The remaining issues of child custody, child support, visitation, and marital distributions of assets (including the distribution of proceeds from the sale of Tabatha's wedding/engagement rings) were submitted to the chancery court.[2] On October 15, 2015, the chancery court entered its opinion and final judgment, granting the divorce on the ground of irreconcilable differences. The chancery court awarded physical custody of the minor child to Brent, weighing the appropriate factors under *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), and providing for reasonable visitation with the mother.[3] Tabatha was ordered to pay $447 in monthly child support, and Brent was ordered to pay Tabatha $300 from the sale of the rings. Tabatha filed a motion to reconsider, which the chancellor denied.

¶6.    On appeal, Tabatha challenges the chancellor's findings of fact as to three of the *Albright* factors, and requests that this Court reverse and render the court's decision and award her physical custody of the minor child. Finding no abuse of discretion in the chancellor's findings, we affirm.

---

[2] This agreed order was not entered into the court's file until October 15, 2015, when the chancery court entered its final judgment.

[3] The parties were awarded joint legal custody.

3

¶7.	Tabatha's claims on appeal concern the chancery court's findings on certain *Albright* factors, specifically, its determination that three factors – moral fitness, parenting skills, and physical and mental health and age of the parents – favored Brent. The court found that only one factor favored Tabatha – the stability of the home environment.[4]

¶8.	"[T]he polestar consideration in child[-]custody cases is the best interest and welfare of the child." *Albright,* 437 So. 2d at 1005. "When reviewing the chancery court's application of the *Albright* factors, the appellate court 'reviews the evidence and testimony presented at trial under each factor to ensure the chancery court's ruling was supported by record.'" *Mitchell v. Mitchell*, 180 So. 3d 810, 816 (¶10) (Miss. Ct. App. 2015) (quoting *Hollon v. Hollon,* 784 So. 2d 943, 947 (¶13) (Miss. 2001)). We will not "reweigh the evidence" — if the chancellor's findings of fact "are supported by substantial evidence," we will defer to those findings. *Id*.

*A.	Parenting Skills*

¶9.	Although the chancellor noted that neither party had any "real concerns about each other's parenting skills," she found in favor of Brent on this factor as Tabatha had "allowed the child to ride in a vehicle without being buckled in a car seat and permitted her mother to teach [the child] an inappropriate word." Tabatha contends that the chancery court improperly weighed this evidence against her, noting that this was a single incident. She

---

[4] This was due to the fact that Tabatha continued to reside in the marital home; Brent resides in an apartment and relies on his mother for day care. The chancery court found that, as to the remaining *Albright* factors, neither party was favored.

4

claims Brent "sensational[ized]" this story at trial and argues that "[t]o call this situation an emergency or even an incident that deserves significant attention is laughable."

¶10. Brent asserts that Tabatha's testimony regarding the incident was false, and there is evidence in the record to support his claim. Tabatha said the incident regarding the car seat took place in an airport parking lot, but counsel for Brent introduced video evidence of the incident that called into question the veracity of Tabatha's testimony.

> Q. Now, [Tabatha], you testified earlier that was in a parking lot, is that correct?
>
> A. Yes, sir.
>
> Q. Okay. Well, can you explain why on the video there's four or five cars and [eighteen] wheelers that are passing by at high rates of speed?
>
> A. I couldn't tell you. I was in the airport parking lot, I mean, just the whole, like cell phone waiting area. I mean, there's roads next to it. I'm not sure what angle this is at.
>
> Q. And going under a bridge?
>
> A. I, I guess so. I'm not sure.
>
> . . . .
>
> Q. [D]o you recall being on your cell phone texting while you were driving?
>
> A. I'm not texting. It was my GPS.
>
> . . . .
>
> Q. Okay. So, you were driving home when this happened?
>
> A. No, I'm in the parking lot setting up my GPS. I told you my mom was, you know, she had to get a hold of my stepdad and that's why we were still kind of lingering around.

5

Q.      Okay.  But you're not sitting still?

A.      Correct.

Q.      And your mother is telling your son, "Say [']s–head[,] get out of the way[']."

A.      Sure.

Q.      [D]o you recall that?

A.      Something similar, yes.

Q.      And there being traffic in front of you?

A.      Maybe.

. . . .

Q.      But you weren't sitting still in a parking lot in a parking spot?

A.      I never claimed that.  I just said we were in a parking lot, yes.

. . . .

Q.      And more importantly, [the child] was not buckled in?

A.      Correct.

The chancery court viewed the video and evidently found that this incident, isolated or not, was serious enough to warrant a finding that this factor favored Brent.[5]  As Brent notes, "[t]he issue is not whether she is fit, but who is favored by analysis."  We also reviewed the video and find the chancery court's determination supported by the record.

---

[5] There was also testimony that Brent was, at one point, the primary caregiver – driving and picking up the child from daycare, bathing him, and feeding him.  Tabatha refuted this testimony, claiming that she dressed the child in the mornings, but she admitted that Brent took their child to and from daycare.

### B.    *Physical and Mental Health and Age of the Parents*

¶11.    The chancellor observed that both Brent and Tabatha were in good health and "are of an age to ably take care of a four[-]year-old child."  However, due to Tabatha's suicide attempt, and the fact that Brent "had no mental health issues," the chancellor found this factor favored Brent.

¶12.    Tabatha downplays her "alleged suicide attempt," noting that it was almost two years before the trial, and she had "completed extensive counseling."  Whether she intended to kill herself or not, it is evident that Tabatha desired attention and was willing to go to extreme lengths to get that attention.  Tabatha claimed at trial she only took the sleeping medication to see if anyone cared about her; she had no intention of ending her life.  She testified:  "I wanted people to understand that I really was hurting and I really was at a low point in my life[.]"  The counselor's report noted that Tabatha said, "I wanted people to see I was really at my wits end."[6]  Tabatha also testified that she sent her former lover a nude photo because she "was getting no attention" from Brent, and she got breast implants in June 2013 so Brent would "find her attractive again."

¶13.    To counter this evidence, Tabatha introduced at trial a text from Brent from July 2011, in which he said to her, "How about if I just go f–ing kill myself[?]"  Brent argues that there was no evidence of "any mental disorder or intent to actually carry out any threats" on his part, and we find the record supports his argument.  Brent said he made an "idle" threat during the marriage after Tabatha "stormed out of the house" during an argument.  Tabatha,

---

[6] The day prior to the suicide attempt, on October 31, 2013, Tabatha met with a mental-health counselor, who observed she was "tearful" and "visibly shaky."

7

on the other hand, committed a desperate, and potentially fatal, act in an attempt to either harm herself or gain sympathy and attention. Therefore, we conclude that the chancery court's finding that this factor favored Brent is supported by substantial evidence.

### C. Moral Fitness

¶14. In finding that this factor favored Brent, the chancery court noted Tabatha's adultery and the nude photographs that she sent to "her former paramour" during a time in which the Kalmons were attempting to reconcile. The court was also "particularly troubled with [Tabatha's] suicide attempt." Although Tabatha was commended for receiving counseling, the chancellor expressed concern that Tabatha is no longer receiving any counseling and was "not totally convinced" by Tabatha's reassurances that she was "doing fine."

¶15. Tabatha acknowledges that she had a "brief extramarital relationship," but she contends this is "a marital issue, not a custody issue." She notes that the minor child never met Jonathon, and she argues that, despite Brent's claims to the contrary, there is no proof she "had any further relationships." She also asserts that Brent had sent text messages to ex-girlfriends prior to the couple's separation and had introduced his new girlfriend to the child. Tabatha is correct that "[m]arital fault should not be used as a sanction in custody awards." *Albright*, 437 So. 2d at 1005. "However, adultery is a factor to be considered in evaluating moral fitness, though not given 'undue weight.'" *White v. White*, 166 So. 3d 574, 586-87 (¶36) (Miss. Ct. App. 2015) (quoting *Blakely v. Blakely,* 88 So. 3d 798, 804-05 (¶26) (Miss. Ct. App. 2012)).

¶16. Tabatha told Brent that the reason for the affair was that she "was just drunk," and she

8

continued to communicate with her former lover months after the affair was discovered, sending him nude photos. She also let a male friend sleep over in the guest room when the child was home, although there was no evidence presented that he was more than a friend. Tabatha admitted at trial that she had stayed out all night on one occasion, while Brent was home with their child, and she failed to contact him. She claimed she was "not in any state" to go home because she had an "allergic reaction" to a couple of glasses of wine, and the battery had died on her cell phone. We find this evidence, as well as Tabatha's past mental-health issues, supports the chancery court's finding. This issue is without merit.

¶17. Accordingly, we affirm the judgment.

¶18. **THE JUDGMENT OF THE CHANCERY COURT OF LOWNDES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**