# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00624-COA

VASHELLE MAY                                                    APPELLANT

v.

BRIAN HUNTER BROWN                                              APPELLEE

DATE OF JUDGMENT:             05/05/2023
TRIAL JUDGE:                  HON. LAWRENCE LEE LITTLE
COURT FROM WHICH APPEALED:    CALHOUN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       EDWARD DUDLEY LANCASTER
ATTORNEY FOR APPELLEE:        PAUL M. MOORE JR.
NATURE OF THE CASE:           CIVIL - CUSTODY
DISPOSITION:                  AFFIRMED - 07/16/2024
MOTION FOR REHEARING FILED:

### BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1.     Vashelle May appeals from the chancery court's child-custody modification order that granted Brian Hunter Brown "primary care[,] control[,] and custody of the [couple's] minor child [P.M.B.]."[1]  Because we find that substantial evidence in the record supports the chancellor's custody modification, we affirm the order of the Calhoun County Chancery Court.

### PROCEDURAL HISTORY AND STATEMENT OF FACTS

¶2.     May and Brown had a son, P.M.B., who was born in February 2017.  May and Brown were not married.  In July 2017, May filed a "Complaint for Child Custody, Child Support

---

[1] We use initials to protect the identity of the minor child.

and Other Relief" against Brown in the Calhoun County Chancery Court. Among other relief, May sought "primary care, control and custody of P.M.B." and "joint legal custody."

¶3. An "Agreed Order" was entered in February 2018 addressing, among other matters, child custody, child support, and visitation.[2] The Agreed Order granted May "the primary physical care, custody and control of [P.M.B.]" and further provided that "[t]he parties shall share joint legal custody of [P.M.B.]." "Joint legal custody" was defined in the Agreed Order with reference to Mississippi Code Annotated section 93-5-24(5)(e) (Rev. 2021), which provides: "'joint legal custody' means that the parents or parties share the decision-making rights, the responsibilities[,] and the authority relating to the health, education[,] and welfare of a child [(i.e., P.M.B.)]." Miss. Code Ann. § 93-5-24(5)(e). The Agreed Order further provided that the parties acknowledge "that they are both obligated each to the other to exchange information concerning the health, education[,] and welfare of the minor child, and to confer with one another in the exercise of decision-making rights, responsibility[,] and authority." *Id.*

¶4. Brown was ordered to pay $150.00 per month in child support and was awarded visitation every other weekend, four weeks in the summer months of June and July, and specified times for holidays, birthdays, and the week of spring break once P.M.B. began kindergarten.

---

[2] The Agreed Order also delineated the terms for health insurance, taxes, and attorney's fees.

¶5. The Agreed Order set forth nineteen rules and obligations of the parties, including, in relevant part:

> [May] shall keep [Brown] informed of the child's school and extracurricular activities, as well as school progress, if applicable, including providing copies of report cards when the child reaches school age.
>
> Both parties agree that if either of them has knowledge of any illness, accident, or other circumstances seriously affecting the health or welfare of the child, [Brown] or [May], as the case may be, will promptly notify the other of such circumstances.
>
> The parties shall exert every reasonable effort to foster a feeling of affection between the child and the other party. Neither party shall do anything which may estrange the child from the other party or injure the opinions of the child as to [May] or [Brown], or which may hamper the free and natural development of the child's love and respect for the other party.
>
> . . . .
>
> Each parent shall notify the other of any plans to travel out-of-state with the minor son at least three (3) days in advance of travel.

¶6. In late July 2022, May moved to Plano, Texas. In August 2022, Brown filed a "Petition for Modification of Child Custody, Contempt and Other Relief," averring that May's move from Mississippi to Texas resulted in a "material change in circumstances" making "joint legal custody improbable and impossible" and that it would be in P.M.B.'s best interest for Brown to be awarded the "primary physical care, control[,] and custody of [P.M.B.]." May filed an answer to Brown's petition, denying Brown's averments. She also filed a counterclaim seeking, among other things, a modification of the February 2018 Agreed Order to allow Brown supervised visitation only. Brown denied May's averments

3

in his response to May's counterclaim.

¶7.     The chancery court held a two-day trial on Brown's petition and May's counterclaim beginning on February 22, 2023.[3]  Both parties were represented by counsel.  We begin with a brief overview of the trial, followed by a summary of the testimonies and evidence presented.

¶8.     Brown presented his case first.  He began by calling May as an adverse witness.[4] Following May, Brown testified, as well as Brown's fiancée Danica Alred and Brown's grandmother Linda Butler (sometimes referred to as Memaw Linda).

¶9.     At the close of Brown's case-in-chief, May moved ore tenus to dismiss Brown's petition, asserting that Brown failed to present sufficient evidence that there was a material adverse change in circumstances resulting from her move to Texas that would justify modifying child custody.  After hearing counsel's arguments, the chancellor denied May's motion to dismiss.

¶10.    May proceeded with her case.  May's first witness was Brother Will Turner, who was associated with Pleasant Ridge Church in Banner, Mississippi.  Following Brother Turner, May testified.  After the close of May's case, Brown testified as a rebuttal witness.

¶11.    At trial, the parties' testimonies established that May and Brown had one child

---

[3] Between the filing of Brown's petition and the first day of the trial, the chancery court entered several agreed temporary orders concerning visitation, which will be discussed in context.

[4] May's counsel reserved May's direct examination for when her own case was presented.

4

together, P.M.B., who was born in February 2017. P.M.B. had just turned six at the time of trial. May and Brown were never married. They lived together in Calhoun County, Mississippi, until they separated in June 2017.

¶12. When May and Brown separated and entered into the February 2018 Agreed Order governing custody and visitation, the parties lived in adjacent Mississippi counties. Brown lived in Houlka in Chickasaw County, and May lived in Calhoun County. As set forth above, the February 2018 Agreed Order granted "primary" physical custody to May. May and Brown had joint legal custody. Brown had visitation with P.M.B. every other weekend, specified times for holidays, four weeks in the summer, and the week of spring break every even year to begin when P.M.B. began kindergarten.

¶13. May acknowledged that before she moved to Texas, she and Brown had a good relationship as far as abiding by the visitation schedule and agreeing to additional visitation times than just those in the Agreed Order. She also testified that in 2019 and 2020, she had taken out-of-state job opportunities to help herself financially. In 2019, May worked on a pipeline in Texas for several months. Brown testified that he was living with his grandmother (Butler) at that time and had custody of P.M.B. for weeks at a time while May was gone during the first few months of 2019. Brown took care of P.M.B. with Butler's help.[5] In the fall of 2019 or early 2020, May accepted a job in Nebraska, and P.M.B. was in

_____

[5] Brown's testimony regarding the times he cared for P.M.B. during this period was corroborated by Butler's testimony. She had kept a calendar showing the dates Brown had custody of P.M.B.

Brown's custody for four months.

¶14. May, Brown, and Butler all testified that Butler helped both Brown and May take care of P.M.B. and that Butler was very involved with P.M.B.'s life. May testified that P.M.B. "loves his Memaw Linda," and that she (May) "values their relationship." May acknowledged her confidence that Butler could take care of P.M.B., though she (Butler) was getting older. May further acknowledged that she has no problem with the family support system Brown has to help him with P.M.B. May also recognized that Brown and P.M.B. have a "great relationship," and she "values their relationship" together.

¶15. Brother Turner testified that he and his wife have known May and P.M.B. for about two years (at the time of trial). He did not know Brown and had not observed Brown with P.M.B. May cleaned the Turners' home, and they helped her purchase their car through owner-financing. Brother Turner and his wife spent time with May and P.M.B. before May moved to Texas, and he and his wife saw P.M.B. after May moved when May and P.M.B. visited Mississippi. According to Brother Turner, P.M.B. is "just a normal, happy kid" with "several mamas . . . [who] love on him" at Pleasant Ridge Church in Banner, Mississippi.

¶16. In "about 2021," May established her own construction and residential cleaning business and, at the time of trial, had one full-time and one part-time employee in Mississippi and one part-time employee in Texas. May moved to Plano, Texas, with P.M.B. in late July 2022. Plano is approximately eight hours from Calhoun County, Mississippi.

¶17. May testified that she told Brown during a phone call on July 26, 2022, that she was

6

moving to Texas. She said that she also sent him a text message in January 2022 stating, "I'm going to Texas 4-13 to see about expanding my business." Although she had signed a lease for an apartment on July 27, 2022, May did not tell Brown her Texas address when she moved.

¶18. May testified that in early August (after she moved to Texas) she "let his dad get his . . . visitation [with P.M.B.]" in Mississippi. May said that she allowed the visitation on the condition that Brown would meet her in Monroe, Louisiana, with P.M.B. on the following Sunday. Brown did not take P.M.B. to Louisiana on that day. According to Brown, he followed the advice of his lawyer so that they could get May to come to Calhoun County, Mississippi, to pick up P.M.B. so she could be served with process for this action. Brown and his lawyer acted this way because May had not told Brown where she was living in Texas. Brown had enrolled P.M.B. in school in Houlka, Mississippi. May traveled to Mississippi to get P.M.B., and she and P.M.B. returned to Texas.

¶19. May admitted that she did not allow Brown any further visitation with P.M.B. for the rest of August or in September, October, and most of November.

¶20. Through correspondence exchanged between the parties' lawyers, Brown agreed to May's offer to allow visitation on October 1, but May then withdrew the offer. According to May, she was not given enough notice about the October 1 visitation plans. A few days later, May offered to meet Brown in Monroe the next evening to exchange P.M.B. for visitation. Brown could not make this meeting because of his employment, so he did not get

visitation with P.M.B. The parties entered into an agreed temporary order on November 7, 2022, granting Brown a week of visitation for Thanksgiving. A second agreed temporary order was entered into on December 16, 2022, granting Brown Christmas visitation under the terms specified in that order.

¶21. Brown lives with Alred in a three-bedroom mobile home. At the time of trial, they had been together for over five years and were engaged to be married in September 2023. They have two children together. Alred stays at home with the two children, and Brown works from 8:30 a.m. until 5:30 p.m. as a warehouse leader for Pepsi in Tupelo. He has worked at Pepsi since June 2020. As of the February 2023 trial, Brown had earned three promotions. Brown was convicted of a drug charge "in 2014 or 2015," which was expunged after he completed a drug court program. Brown testified that as of the time of trial he had not used methamphetamine for seven or eight years. He admitted to smoking marijuana on New Year's Eve of 2022. Brown is subject to random drug tests through his employment with Pepsi and has been tested four times since he began working there.

¶22. Brown testified that in addition to Alred, his grandmother (Butler), mother, step-father, and aunt are available to help him care for P.M.B., as needed. They all live within five to fifteen minutes of his home.

¶23. May married Carlos Tarras in May 2022. They have an apartment in Plano, Texas, and a home they are renting in Bruce, Mississippi. Tarras also has a camper trailer in Derma, Calhoun County, Mississippi, where they sometimes stay when they are in Mississippi. As

noted, May has a cleaning business that she operates in Mississippi and Texas. She has one part-time employee in Texas, and she also works from around 8:00 a.m. to 2:30 p.m. each day. Tarras has a business that he operates in Calhoun County.

¶24.    The record reflects that when P.M.B. was in four-year-old kindergarten in Bruce, Mississippi, he missed fifty days of school while in May's custody. At the time of trial, P.M.B. was enrolled in kindergarten in the Plano School District. May testified that the school sends her progress reports on P.M.B. every six weeks. She acknowledged that she was required under the February 2018 Agreed Order to keep Brown informed of P.M.B.'s school progress. May admitted, however, that she had never sent these progress reports to Brown, nor did she bring any such reports to trial.

¶25.    May testified that in addition to her husband, she has two friends who help her with P.M.B. in Texas. May testified that her mother, sisters, and one set of grandparents live in Mississippi, and she goes to Calhoun County nearly every holiday.

¶26.    Brown and May both testified that since May's relocation, interactions between them often end in arguments. Their relationship is not harmonious. May testified that Brown became physical with her at one point when she went to pick up P.M.B. at his grandmother's home, but Brown testified that it was actually May who put her hands around his neck during that episode. Brown admits to losing his temper with May and using vulgar language, but he testified that this happens only after she provokes him by ignoring his texts or calls concerning P.M.B. or trying to dictate the terms of visitation.

¶27. May testified at length about attempts she made to "allow" Brown visitation with P.M.B., but Brown denied such attempts. As an example, Brown testified that May was not truthful with him with respect to when she would be in Mississippi for the trial, which resulted in him missing visitation time with P.M.B. while he (Brown) had a week off work. According to Brown, May also did not tell Brown that P.M.B. had a scheduled doctor's appointment at Le Bonheur Children's Hospital in Memphis during that same week. Had he known, he would have gone to that appointment. May testified that she "may have gotten mistaken with [her] dates," resulting in the miscommunications.

¶28. After entry of the chancellor's opinion on March 13, 2023, which included his findings of facts and conclusions of law (March 13, 2023 Opinion), the chancellor entered his order on May 5, 2023, granting Brown's petition (May 5, 2023 Order). The May 5, 2023 Order adopted the chancellor's March 13, 2023 Opinion by reference. In relevant part, the order awarded Brown "the primary care[,] control[,] and custody of [P.M.B.], effective immediately."

¶29. Details of the chancellor's findings of fact and conclusions of law on this issue are discussed in context below.

¶30. May appeals only the custody modification, describing the sole issue on appeal as follows:

> The lower Court should have granted the Motion to Dismiss the Complaint, which was made orally by [May's] trial attorney . . . . It was argued in said oral motion that in order to cause a modification of a prior custody order, the material change in circumstances must have been (1) unforeseeable, (2) have

10

been shown to have an adverse effect on the child. This must have been proven by a showing more than the moving of one party or the other. This is especially true in the case at bar in which the parties have joint legal custody and [May] was ordered primary physical custody.

**STANDARD OF REVIEW**

¶31. "The standard of review in a child custody case is quite limited in that the chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this court to reverse." *Blagodirova v. Schrock*, 368 So. 3d 1261, 1264 (¶10) (Miss. 2023). In particular, "[i]f there is substantial evidence in the record to support the chancellor's findings of fact, no matter what contrary evidence there may also be, we will uphold the chancellor's decision." *Id.* (quoting *Bower v. Bower*, 758 So. 2d 405, 412 (¶31) (Miss. 2000)). In appeals concerning child custody matters, this Court's "polestar consideration, like the chancellor's, must be the best interest of the child." *Munday v. McLendon*, 287 So. 3d 303, 309 (¶26) (Miss. Ct. App. 2019).

**DISCUSSION**

¶32. On appeal, May argues that the chancery court erred by denying her ore tenus "motion to dismiss" Brown's request for child custody modification that she asserted at the close of Brown's case-in-chief. "Mississippi Rule of Civil Procedure 41(b), which governs involuntary dismissals, applies in actions tried by the court without a jury, where the judge is also the fact-finder." *Page v. Graves*, 283 So. 3d 269, 274 (¶21) (Miss. Ct. App. 2019) (citation and internal quotation marks omitted).

¶33. Once the chancellor denied May's Rule 41(b) motion to dismiss, however, May

11

proceeded to present proof in her own case. By proceeding with her case and counterclaim, May "waived any right to appeal whether the chancellor erred in denying [her] motion." *Cotton v. Cuba Timber Co.*, 825 So. 2d 669, 672 (¶12) (Miss. Ct. App. 2002) (citing *Stallings v. Bailey*, 558 So. 2d 858, 859 (Miss. 1990)). May, however, still has "the right to challenge the weight or sufficiency of the evidence to sustain the . . . [order], only we consider the point by reference to all evidence in the record and not merely that before the Court at the time of . . . [May's] original motion to dismiss." *Stallings*, 558 So. 2d at 859; *see Century 21 Deep S. Props. Ltd. v. Corson*, 612 So. 2d 359, 369 (Miss. 1992); *Clements v. Young*, 481 So. 2d 263, 268 (Miss. 1985); *Cotton*, 825 So. 2d at 673 (¶12). We apply this principle here under "the substantial evidence/manifest error standards" as stated above. *Kerr v. Kerr*, 323 So. 3d 462, 472 (¶28) (Miss. 2021).

¶34.  To modify child custody, the non-custodial parent (Brown) is required to prove "(1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody." *Mabus v. Mabus*, 847 So. 2d 815, 818 (¶8) (Miss. 2003). Brown, "as the parent requesting a change of child custody, . . . bears the burden of proving a material, adverse change in circumstances by a preponderance of the evidence." *Page*, 283 So. 3d at 275 (¶24).

¶35.  The chancellor "must" consider "[t]he totality of the circumstances" in determining whether there has been "a material or substantial change in the circumstances of the parties."

*Blagodirova*, 368 So. 3d at 1264 (¶12).  If after examining the totality of the circumstances the chancellor finds that a material change in circumstances has occurred, then the chancellor "must separately and affirmatively determine that this change is one which adversely affects the child[.]"  *Bredemeier v. Jackson*, 689 So. 2d 770, 775 (Miss. 1997).

¶36.    "If the court finds an adverse material change, then the next step is to apply the *Albright*[6] factors to determine whether modification is in the child's best interest."  *White v. White*, 26 So. 3d 342, 351 (¶28) (Miss. 2010).

### I.    Adverse Material Change in Circumstances

¶37.    The chancellor cited the same principles addressed above in his opinion.  Quoting *Munday*, the chancellor also specifically recognized:

> "Although Mississippi law generally has recognized that a parent's relocation
> alone does not constitute a material change in circumstances, . . . the impact
> of a relocation of the custodial parent upon the child constitutes a factor that
> the chancellor permissibly considers on the motion for modification."  *Munday
> v. McLendon*, 287 So. 3d 303, 310 [(¶29)] (Miss. Ct. App. 2019).

The chancellor further noted, "'Totality of the circumstances can serve as a basis for a material change.' [*Id*. at (¶28)]."

¶38.    With respect to the "material change in circumstances" factor, the chancellor found: "There can be no question that [May] moving to Plano, Texas, eight (8) hours away from [Brown], is a material change in circumstances.  It is impractical and would impose an unacceptable burden on [P.M.B.] to continue with the alternating weekend custody

---

    6 *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

13

arrangement upon which the parties initially agreed."

¶39. The chancellor then applied the law requiring that once he has determined that a material change in circumstances has occurred, he "must separately and affirmatively determine that this change is one which adversely affects the child." *Munday*, 287 So. 3d at 310 (¶28). On this point, the chancellor found:

> In this case, it is difficult for [Brown] or [Brown's] family to present evidence of any adverse [e]ffects to [P.M.B.] as they have had very little access to [P.M.B.] over the last seven (7) months. The only evidence presented regarding [P.M.B.'s] current condition was [May's] testimony and [May] has credibility issues. What is of the utmost concern to the Court is [May's] active efforts to limit or prevent [Brown's] time with [P.M.B.]. These actions in conjunction with [May] moving [P.M.B.] away from all of his family and her attempts to fabricate justification for her actions lead the Court to find that there has been a material change in circumstances that, when considering the totality of the circumstances, has had an adverse [e]ffect on [P.M.B.].

¶40. We find no error in the chancellor's determination that an adverse material change in circumstances occurred in this case. The circumstances the chancellor cited in support of his decision are very similar to those in *Munday*, a case in which this Court found no reversible error in the chancellor's determination that a material change in circumstances adversely affected the divorced couple's minor child. *Munday*, 287 So. 3d at 310-11 (¶¶30-32). The chancellor in *Munday* found:

> In the matter at hand, it appears that there has not been one specific event that warrants a modification of custody, but when considering the totality of the circumstances, a modification is warranted. Taking into consideration the lack of communication regarding the move to Louisiana and the transfer to a new school, removing [B.A.M.] from her extended family and friends, the numerous absences which, under Louisiana law, could subject [the mother] to prosecution, the alleged move to Tennessee, and the breakdown of

14

communication between father and daughter caused by the mother, lead me to believe that the minor child has been adversely affected both emotionally and mentally by the current custodial arrangement and an *Albright* analysis is appropriate.

*Id.* at 310-11 (¶30) (emphasis omitted). This Court affirmed the chancellor's finding. *Id.* at 311 (¶32).

¶41. Similarly, in this case, the chancellor found an adverse material change in circumstances based upon May's relocation, coupled with her "active efforts" to prevent or limit Brown's time with P.M.B., her removal of P.M.B. "from all of his family," and her "attempts to fabricate justification for her actions." The chancellor also found that May moved to Texas with P.M.B. after giving Brown no more than a week's notice, and "[May] did not disclose to [Brown] the address of her new residence in Texas."

¶42. Like this Court in *Munday*, "viewing the totality of the circumstances, we cannot say the chancellor erred by finding that a material change in circumstances had occurred since the time of the original custody decree," *id.* at 311 (¶32), and that this "material change adversely affected [P.M.B.]." *Id.* The chancellor properly reasoned that May's move, alone, would not constitute an adverse material change in circumstances but, instead, considered the totality of the circumstances in reaching his decision that May's move made the parties' original custody arrangement "impractical" and adversely affected P.M.B. *See Robinson v. Brown*, 58 So. 3d 38, 43 (¶14) (Miss. Ct. App. 2011) (recognizing "that in certain cases, even a short move can result in a material change in circumstances where the move by one party caused the custody arrangement to become impractical or impossible to maintain").

15

¶43.    May asserts that the chancellor erred in modifying child custody "by failing to require that the change in circumstances be unforeseeable" when addressing the material-change-in-circumstances factor.  We find that this assertion is unpersuasive in light of the chancellor's detailed findings of fact and consideration of the "totality of the circumstances" in making his decision.  Indeed, "the material change in circumstances must be unforeseeable *at the time of the original decree*." *Giannaris v. Giannaris*, 960 So. 2d 462, 469 (¶12) (Miss. 2007) (emphasis added).

¶44.    In this case, when the Agreed Order addressing child custody was entered in February 2018, May and Brown lived in adjacent Mississippi counties.  Although May worked out-of-state in 2019 and early 2020, she returned to Mississippi from those temporary jobs.  May did not start her cleaning business until "2021 or 2022," over three years after the Agreed Order was entered.  Further, the chancellor found that even at the time of trial, she only had one part-time employee in Texas, while May and her husband continued to operate two different businesses in Calhoun County, Mississippi.  May testified she continues to have business dealings in Mississippi with clients in "Calhoun, Pontotoc, . . . [and] Chickasaw" Counties, as well as in "Oxford [and] Eupora."  May has no family in Texas, and the chancellor found that, "[m]ost of [May's] family live[s] in Mississippi."  In short, evidence of any purported foreseeability of May's move as of February 2018 is negligible, at best.  Viewing the totality of the circumstances, we find no error in the chancellor's determination that a material change in circumstances had occurred since February 2018, when the original

16

custody decree was entered.

¶45. May also asserts that "there is no evidence of an adverse effect on [P.M.B.]." We find this assertion is without merit. As we have addressed above, the chancellor properly made specific findings with respect to this factor, and we find no error in his determination.

## II. The *Albright* Factors

¶46. Having found an adverse material change in circumstances, the chancellor then recognized that he "must conduct an *Albright* [a]nalysis to determine the best interests of P.M.B." In this regard, the chancellor noted that "*Albright* established that the polestar consideration in child custody cases is the best interest and welfare of the child."[7] *Albright* sets forth a number of factors for the court to use in undertaking this analysis, as follows:

> (1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship.

*Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001) (citing *Albright*, 437 So. 2d at 1005). Citing *Lee*, 798 So. 2d at 1288 (¶15), the chancellor also specifically observed that "[t]he *Albright* factors are not to be applied in the manner of a score sheet or mathematical

---

[7] *See Albright*, 437 So. 2d at 1005 ("We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child.").

formula"; rather, "[t]he [c]hancellor may give special weight to one, two or several factors to determine the outcome. *Divers v. Divers*, 856 So. 2d 370, 376 [(¶27)] (Miss. [Ct.] App. 2003)."

¶47. The chancellor devoted four pages of his opinion to addressing the *Albright* factors, making specific findings with respect to each factor. He found that P.M.B.'s school record and the stability of home environment factors favored Brown and that P.M.B.'s sex "slightly favored" Brown "[b]ecause a male child can benefit from a male influence." Additionally, the chancellor set forth "other relevant factors" that also "strongly favored" Brown. We address these factors below. The chancellor found that one factor—continuity of care—"slightly favor[ed]" May. On this factor, the chancellor found: "While [May] has had longer periods of continuous care of [P.M.B.], there were significant amounts of time in 2019 and 2020 when she left [P.M.B.] in the care of [Brown]. This factor slightly favors [May]." The chancellor found that the remaining factors favored neither party in light of the testimonies and evidence presented at trial.[8]

¶48. May does not challenge the chancellor's findings on any factor, nor does she even acknowledge the chancellor's findings set forth in his opinion. Rather, May generally states that "[n]owhere in this case is it shown that the best interest of the child would be served by changing custody in this case." We find that this general statement, unsupported by any

---

[8] The chancellor found that the preference-of-the-child factor did not apply because P.M.B. was only five years old (and had just turned six before trial).

reasons or meaningful argument, is insufficient to preserve error on this point on appeal. *Reading v. Reading*, 350 So. 3d 1195, 1200 (¶22) (Miss. Ct. App. 2022) (recognizing that "[t]he appellant must support his argument with reasons and authorities . . . [as] part of [his] . . . burden on appeal") (citation omitted)); *see* M.R.A.P. 28(a)(7).

¶49. Not only do we find that May's general statement regarding the chancellor's *Albright* analysis is procedurally barred, but we also find that it is baseless. In addressing this issue, we bear in mind that while "[a]ll the [*Albright*] factors are important, . . . the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). "The chancellor, by his presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Kerr*, 323 So. 3d at 471 (¶23). Further, as noted above, the *Albright* factors need not "be given equal weight in every case . . . . A single factor can weigh so heavily in favor of one party that equity would require granting custody to that parent." *Divers*, 856 So. 2d at 376 (¶27).

¶50. Regarding the neutral factors, we find that upon review, the chancellor fairly assessed the evidence and testimony presented at trial in finding that these factors favored neither party. We further find no error in the chancellor's finding that the continuity-of-care factor "slightly favor[ed]" May. As to the remaining factors and "other relevant factors" that the chancellor found in Brown's favor, we address them in turn.

19

¶51. Regarding the home, school, and community record factor, the chancellor found:

> [P.M.B.] is only five (5) years old and has limited records regarding school or community. The only records presented at trial were that [May] had allowed [P.M.B.] to miss fifty (50) days of four (4) year old pre-K because she did not believe that attendance was required. This factor favors [Brown].

We find no error in the chancellor's assessment.

¶52. On the stability of the home environment factor, the chancellor found:

> Both parties have moved several times since [P.M.B.] was born but until August of 2022 all residences were in the Calhoun County or Houlka area. [Brown] now has an established home with his fiancee and their two (2) children. [May] has homes in Texas, and Bruce, Mississippi[,] and testified to sometimes staying with her husband in a camper in Derma[,] [Mississippi]. This factor favors [Brown].

Again, we find no error in the chancellor's analysis.

¶53. Most importantly, the chancellor found "other relevant factors" that "strongly favor[ed] [Brown]," as follows:

> [May] attempted to convince the Court that [Brown] did not request time with [P.M.B.] or accept time offered with [P.M.B.] However, what became apparent to the Court was [May's] attempts to make it difficult to impossible for [Brown] to exercise any visitation with [P.M.B.] during the last seven (7) months and then mischaracterize the facts of the situation. The Court finds this to be a willful attempt to interfere with [Brown's] relationship with [P.M.B.] This factor strongly favors Father.

The chancellor was in the best position to judge May's truthfulness and to determine the weight to be afforded the testimonies presented at trial. We find no error in the chancellor's "other relevant factors" analysis. Indeed, we find that his determination on this point is supported by substantial evidence in the record.

20

¶54. After assessing and applying the *Albright* factors to the facts of this case, the chancellor found that the factors favored Brown. After review, we find substantial evidence in the record supports the chancellor's decision. We find that May's general assertion to the contrary is without merit.

## CONCLUSION

¶55. In sum, the chancellor's decision to modify child custody is supported by substantial evidence. That is, we find that substantial evidence in the record supports the chancellor's finding of a material change of circumstances adverse to P.M.B. and that it was in P.M.B.'s best interest to modify child custody by awarding Brown "the primary care[,] control[,] and custody of [P.M.B.]." May appealed no other aspect of the chancery court's May 5, 2023 Order. Accordingly, the May 5, 2023 Order adopting the March 13, 2023 Opinion is affirmed in all respects.

¶56. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

21