# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2000-CA-00872-SCT

*BELINDA QUIN LEE*

*v.*

*JASON GILLIAM LEE*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/29/2000 |
| TRIAL JUDGE: | HON. W. HOLLIS McGEHEE, II |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | BRYAN C. HARBOUR |
| ATTORNEY FOR APPELLEE: | WAYNE DOWDY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED - 10/31/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/21/2001 |

**EN BANC.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1. On January 6, 1999, Belinda Quin Lee (Belinda) filed suit for a divorce from her husband, Jason Gilliam Lee (Jason), on the grounds of habitual cruel and inhuman treatment, as well as habitual and excessive use of alcohol. In her complaint Belinda sought temporary and permanent possession of the marital domicile; equitable distribution of the marital assets; and temporary and permanent custody of their daughter, Lauren Katherine Lee (Lauren). On January 21, 1999, Jason filed an answer generally denying Belinda's claims and sought dismissal of the complaint. Chancellor W. Hollis McGehee II entered a temporary order on February 4, 1999, which (1) awarded temporary joint legal and physical custody of Lauren; (2) ordered that Lauren be re-enrolled at her previous day-care center in Tylertown; (3) ordered the couple to temporarily share the possession and use of the marital domicile with debt obligations to be handled as before; (4) enjoined the couple from harassing or intimidating each other; and (5) prohibited the consumption of alcoholic beverages in the presence of Lauren or each other.

¶2. On February 9, Belinda filed with the Pike County Chancery Court a motion to reconsider the temporary order. In response, the chancellor modified the order to give Belinda "temporary exclusive use, occupancy and possession" of the marital domicile. However, the issues of custody, visitation and support were left unchanged or unaddressed.

¶3. Then, on May 4, 1999, a motion for citation of contempt was filed by Belinda. During the separation, Belinda discovered that Jason tapped the phones and recorded her conversations, including those with her attorney. The issue was never addressed or resolved.

¶4. On the first day of trial, August 25, 1999, Belinda and Jason entered into an agreement whereby the parties consented to a divorce on the grounds of irreconcilable differences and for the chancellor to decide the remaining issues of custody, visitation, support, and equitable distribution. Following the agreement, a two-day trial was held.

¶5. On September 2, 1999, the chancellor entered a final judgment with an accompanying opinion letter, setting forth an analysis of the *Albright* factors, which (1) granted a divorce on the ground of irreconcilable differences; (2) awarded the parties temporary joint legal and physical custody of Lauren to last six months; and (3) reserved a final ruling on all other issues. Specifically as to custody, Jason was to have Lauren Monday morning until Thursday evening and one Saturday per month. Again, Belinda filed a motion to reconsider. In response, the court, recognizing its own errors, took the unusual step of affirming the temporary custody scheme, appointing a guardian ad litem, instructing that a hearing concerning permanent custody be held upon receipt of the guardian ad litem's report, and, setting aside the divorce.

¶6. The next action was the findings of fact and conclusions of law issued on February 11, 2000, in which the chancellor equitably divided the marital assets and determined that Belinda should receive sole use and possession of the marital domicile.

¶7. Finally, on March 29, 2000, without conducting the previously instructed hearing, but after having received and reviewed the guardian ad litem's report as well as examining the custody proposals submitted by both parties, the chancellor entered a final judgment. In its judgment, the court incorporated its previous *Albright* analysis, awarded the parties joint legal custody, gave Jason primary physical custody of Lauren with liberal visitation rights to Belinda, and ordered Belinda pay $250 per month in child support. After another motion to reconsider was denied, Belinda now appeals the final judgment. While her brief contains a litany of assignments of error , the issues on appeal can safely be stated as: (1) whether the trial court erred in its application and analysis of the *Albright* factors; (2) whether the trial court committed reversible procedural errors and/or erroneous findings of fact; and (3) whether the trial court committed reversible error by failing to sanction Jason Lee for tapping the phone of the marital domicile after Belinda Lee had been given exclusive use of the same. In addition, Jason raises concern over (4) whether the provisions of Miss. R. App. P. 28(k) are applicable to Belinda Lee's brief.

## FACTS

¶8. Jason and Belinda were married on December 18, 1992. Their daughter, Lauren, was born on April 10, 1997. At the time of appeal, Jason was 33 years old, and Belinda was 31. Both are in good physical and mental health.

¶9. Jason is employed as a real estate broker in Tylertown, Mississippi. As such, his work schedule is quite flexible, and he is rarely more than 20 minutes from Tylertown at any given time. Belinda is a registered nurse at Lallie Kemp Medical Center in Independence, Louisiana, some 51 miles from the marital domicile in Pike County. While her job does not allow the unfettered flexibility that Jason's does, she demonstrated during the divorce proceedings as well as at trial that her employer gave her considerable leeway in accommodating any scheduling requests.

¶10. The marital home was purchased by the couple from Belinda's grandmother, Aline Quin (Aline), who lives in the house immediately next door. With the help of a loan, the Lees began remodeling the home around the time of their marriage.

¶11. While both Jason and Belinda have contributed to the rearing of Lauren, in her early infancy, Aline assisted the couple a great deal in watching the child. According to trial testimony, Aline watched Lauren quite often and for extended periods of time. At trial, conflicting testimony was given concerning which parent had the primary role of caring for Lauren. It appears from the record that when her schedule permitted it, Belinda handled much of the daily aspects of raising Lauren. When Belinda would work evening or nighttime hours, Jason was largely responsible for Lauren's care.

¶12. Prior to separation, Lauren attended Lear's Day Care in Tylertown. During the separation, Belinda transferred Lauren to Albany Early Learning Center located approximately 15 miles from her work in Louisiana. She claimed the switch was out of convenience and a concern for Lauren's safety. Again, there was dispute over the accuracy of the testimony and the motivation behind the move. In fact, the choice of daycare facilities became a heated and quarrelsome subject during trial. ¶13. Although there was quite a lot of heated arguing over the custody battle, it is apparent that both Jason and Belinda love and care for Lauren. In fact, there was direct testimony at trial that both parents loved their daughter and that she loved them in return. While Belinda introduced testimony regarding Jason's allegedly excessive alcohol consumption, there are no allegations that either parent is unfit to raise Lauren, and the facts of Belinda's allegations will be discussed later.

## DISCUSSION

¶14. The standard of review in child custody cases is rather limited. We reverse only if a chancellor is manifestly in error or has applied an erroneous legal standard. *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995). The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each. *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994). In custody matters, we, as an appellate court, shall not disturb the decisions of chancellors unless it is clear that justice and the law require us to do so. *Id.*

### I. WHETHER THE TRIAL COURT ERRED IN ITS APPLICATION AND ANALYSIS OF THE *ALBRIGHT* FACTORS.

¶15. In child custody cases, the polestar consideration is the best interest of the child, and this must always be kept paramount. *Sellers v. Sellers*, 638 So. 2d 481, 485 (Miss. 1994). To help guide us to a proper determination as to custody, the court considers the following factors in determining the child's best interests: (1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship. *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). While the *Albright* factors are extremely helpful in navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula. Determining custody of a child is not an exact science.

¶16. In the case sub judice, the chancellor made on-the-record findings for each *Albright* factor and obviously weighed the concerns of both parties. However, Belinda contends that in his analysis, the

chancellor was manifestly in error in making certain findings which were not supported by substantial evidence, as well as failing to make findings which were supported by the evidence. Furthermore, Belinda contends that the chancellor erred specifically in failing to find a preference for her with regard to the age and sex of Lauren, in effect abandoning the tender years doctrine. Therefore, it is appropriate that we briefly revisit the chancellor's analysis of each *Albright* factor to see if he committed manifest error.

### 1) Age, Health and Sex of the Child

¶17. Lauren is female and was born in April of 1997. At the time of trial, Lauren was quite young (two and a half to three years old). In the past, this Court espoused what has come to be know as the tender years doctrine, which essentially states that if the mother of a child of tender years (i.e. early in development) is fit, then she should have custody. *Law v. Page*, 618 So. 2d 96, 101 (Miss. 1993). However, as previously stated, the age and sex of a child are merely factors to be considered under *Albright*, and this Court has significantly weakened the once strong presumption that a mother is generally best suited to raise a young child. In *Mercier v. Mercier*, 717 So. 2d 304, 307 (Miss. 1998), we held that the tender years doctrine has been gradually weakened in Mississippi jurisprudence to the point of now being only a presumption.

¶18. In the present case, the chancellor simply stated, "[a]t the present time, neither Belinda nor Jason enjoy a distinct advantage in regard to any of these three factors." While neither party may not have enjoyed a "distinct advantage" as to this issue, the tender years presumption is still a viable consideration. Consequently, this factor probably should have weighed slightly in favor of Belinda, unless there was some evidence to the contrary which a review of the record did not readily reveal. However, this minor error alone does not rise to the level of manifest error and certainly does not warrant reversal. In addition, there is the practical consideration that Lauren is presently over four years old and may not be subject to the tender years idea any longer.

¶19. Belinda also takes issue with Lauren's health while in Jason's care, alleging that an ear infection was being improperly treated and allowed to fester. In addition, Belinda attempts to use her position as a nurse and her degrees in elementary and preschool education as further evidence that she is better suited to care for Lauren's health. However, the only evidence introduced to support the notion of improper health care was Belinda's own opinion testimony. When questioned about the matter, Dr. Albert Ray Lee, Jr., Lauren's grandfather and a licensed family physician, asserted that Lauren was in excellent health and any illnesses she had suffered were being greatly exaggerated. Furthermore, the guardian ad litem's report contained no mention of health problems. The chancellor had the opportunity to observe the witnesses and examine all the evidence, and he felt that this element did not favor either party.

### 2) Continuity of Care

¶20. Belinda does not take issue with the chancellor's analysis as to this factor, so we need merely review it. In his opinion letter, the chancellor stated that during the course of Lauren's upbringing, both parents had shared in her rearing. At various times, one parent may have spent more time caring for Lauren than did the other; however, "the continuity of care is close to equal but there is an advantage to Belinda." Both parents share an emotional and loving bond with Lauren. We shall not question the chancellor's judgment as to this matter.

### 3) Parenting Skills and Willingness and Capacity to Provide Primary Care

¶21. The chancellor found "that Belinda has an advantage as to parenting skills primarily based upon Jason's candid admissions that he drank two to four days a week which would significantly impact his parenting abilities." At the same time, the trial court also found that while

> [b]oth parties are very willing and anxious to provide the primary care . . . Jason enjoys an advantage in regard to capacity by virtue of his employment, the location, his hours and nature of his employment versus Belinda's which is much further away from home and the nature of nursing is such Belinda is not in a position to be as flexible as the testimony showed Jason was.

These two considerations, combined, account for the bulk of the evidence introduced at trial. On one hand, Belinda introduced testimony from herself, her sister, and a neighbor that Jason often drank considerable amounts; her attorney essentially made this accusation the basis in asking for custody. At the same time, Jason's counsel made much of the fact that Belinda worked over fifty miles from home and wanted to enroll Lauren in a day care facility near her place of employment that would require waking Lauren up very early in the morning.

¶22. Given our standard of review, we need not reexamine all of the evidence to see if we agree with the chancellor's ruling; our charge is merely to see if the chancellor's decision is supported by credible evidence. While there was testimony concerning Jason's drinking habits, Belinda did not introduce any evidence as to such habits impeding his work, life, or parenting skills. In addition, Jason introduced evidence that while he may drink on occasion, the frequency and amount were being greatly exaggerated. The testimony and evidence concerning Belinda's work schedule, distance from home, and lack of other family members nearby in case of emergency are uncontradicted. All of these considerations are legitimate concerns in the capacity to provide primary care. Furthermore, Jason's counsel made much of the fact that even when Belinda was not working, she placed Lauren in day care. Although we cannot be sure what the chancellor thought to be the most important piece of evidence, there was plenty of credible evidence presented to support the chancellor's decision that Jason had the greater capacity to provide for Lauren's primary care.

### 4) Employment

¶23. The facts of Belinda's and Jason's employment have already been discussed as has the concerns raised by each party over the other's job schedules.

### 5) Physical and Mental Health and Age

¶24. Belinda was born in 1967 and was almost 32 years old at the time of litigation. Jason was born in 1965 and 34 at the time of trial. Both are in good physical and mental health.

### 6) Emotional ties

¶25. Testimony was introduced that both parents are emotionally bonded to Lauren and vice versa. Belinda tries desperately to reargue that she has a stronger bond with her daughter than does Jason. However, the chancellor found that there was not "any substantial advantage to either party based upon emotional ties," and our review of the record reveals nothing to suggest otherwise.

### 7) Moral Fitness

¶26. Again, Belinda asks this Court to reweigh the evidence as it pertains to this issue; again, we refuse to

do so. The chancellor held that "[b]oth parents are morally fit to raise Lauren." Belinda argues that Jason's alcohol consumption, relationship with another woman, and inconsistent statements concerning his finances make the chancellor's ruling as to this issue manifestly erroneous. While those are legitimate concerns and should factor into any decision as to this issue, we are not convinced that this rises to the level of manifest error.

### 8) *Home, School, and Community Record of the Child*

¶27. This particular factor also received considerable attention at trial. Belinda justified her desire to transfer Lauren to a day care closer to her employment by alleging neglect and subpar instruction at Lear's Day Care. The chancellor seemed more focused on keeping Lauren in familiar surroundings, closer to other family members in case of emergency and concern over the distance which had to be covered to the new facility. The chancellor also noted that Belinda did not raise issue with Lear's until the custody battle had already ensued. All of which supports the chancellor's decision.

### 9) *Stability of the Home Environment*

¶28. While the trial court did not find an advantage for either party, it did admonish the couple on the consumption of alcohol as it relates to home stability. In her brief, Belinda argues, in addition to those concerns already addressed, that the plushness of the hearth (trailer v. house) should be a significant factor in a determination on this issue. While a home is always a preferable environment, we cannot hold that the dollar value of a home is determinative for custody purposes. Furthermore, Jason's living arrangements (i.e. the trailer) were in response to losing the marital home to Belinda in the property judgment partly because it was her familial home. It is unfair to ask a man to leave his home then use that factor to also deny him custody of his child. No matter, Belinda did not illustrate how the chancellor's decision was manifestly erroneous, so her argument is without merit.

¶29. In conclusion, it is the chancellor's duty to weigh the evidence, and he is in a better position then this Court to judge the veracity of witnesses and credibility of evidence. In reviewing the record, this Court finds that the chancellor was more than justified in ruling as he did. Belinda's testimony was often unresponsive, and she seemed, at times, to exaggerate matters. The chancellor made on-the-record findings as to every *Albright* factor, and there is no evidence that his decision was manifestly in error or based on an erroneous legal standard. Therefore, we affirm as to this issue.

## II. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE PROCEDURAL ERRORS AND/OR ERRONEOUS FINDINGS OF FACT.

¶30. Belinda raises this issue as a list of errors that cumulatively, if not individually, warrant reversal. The best method for handling such matters is to examine the assignments of error as Belinda has raised them.

¶31. First, Belinda alleges that the chancellor erred in handing down an impossible and muddled temporary order. At first, the order gave the couple joint physical and legal custody of Lauren and joint use and possession of the marital domicile. Sharing a house during divorce proceedings is a very unusual and uncomfortable prospect, as well as being an illogical step in resolving the matter. Belinda, in a motion to reconsider, pointed this out to the chancellor. In answer, the chancellor rightly corrected the mistake by giving Belinda exclusive use and possession of the marital home. However, this complicated matters since the chancellor left in place the provision for joint physical custody of Lauren and did not provide for any

shared custody scheme. Jason refutes this argument by pointing out that while this may have been erroneous, neither Belinda nor he were prejudiced by these mistakes, and equity does not warrant reversal. *See Johnson v. Johnson*, 722 So. 2d 453 (Miss. 1998).

¶32. Belinda next contends that the chancellor erred in the original final judgment dated September 2, 1999. There the chancellor awarded the couple a divorce for irreconcilable differences, as the parties had previously agreed. However, the chancellor awarded the couple temporary joint custody for six months and reserved ruling on permanent custody and equitable distribution until a later date. This Court has previously held that it is error to grant a divorce for irreconcilable differences without making a determination as to all other issues, such as custody and equitable distribution. *Rounsaville v. Rounsaville*, 732 So. 2d 909 (Miss. 1999). Furthermore, Miss. Code Ann. § 93-5-24(2) (1994) provides that "[j]oint custody may be awarded where irreconcilable differences is the grounds for divorce, in the discretion of the Court, upon application of both parents." Here, both parents did not agree, and the chancellor ordered temporary joint custody anyway. Again, as way of retort, Jason points to the *Johnson* case where a similar situation (the court reserved ruling on several issues) occurred and the Court found the error to be harmless. *Id.* Since neither party was prejudiced, Jason argues that reversal is unnecessary.

¶33. When Belinda pointed out the custody determination mistake via another motion to reconsider, the chancellor complicated matters by agreeing with the motion and then revoking the divorce decree some three and a half months after it was entered. Belinda raises the concern over what the revocation would have meant if either party had gotten remarried in the interim. While that truly would have been a legal nightmare, we do not deal in "what-ifs." Again, the chancellor may have erred, but there was no harm or prejudice to either party. Thus, it would be difficult to base reversal, in such a sensitive case as a custody battle, on harmless error.

¶34. Next, Belinda takes issue with the chancellor's appointment of a guardian ad litem after final judgment had been entered. While this is an unusual step, the chancellor had reserved ruling on certain issues, including permanent custody. Since the chancellor stated that an additional hearing was to be held concerning permanent custody upon submission of the guardian ad litem's report, we see the appointment of the guardian ad litem at the time it occurred an appropriate action (aside from the fact that the issue should have been resolved prior to the divorce decree). The appointment of a guardian ad litem to assist in determining custody is not, in itself, reversible error.

¶35. However, the promised additional hearing never took place, and with that mistake we take issue. In accepting and considering the guardian ad litem's report without further hearing, the chancellor essentially considered impermissible evidence, as well as deprived the parents of an opportunity to introduce evidence of changed circumstances or challenges to the report's findings. There can be little argument that the consideration of such material and the lack of a further hearing as ordained in the chancellor's own order harmed and prejudiced the parties.

¶36. True, most of these errors individually would not warrant reversal, but as a whole, something must be done to rectify the situation. After all, a compass and map are required to successfully navigate the labyrinth that is the procedural posture of this case. While statute and case law instruct that a custody determination must be made before a divorce for irreconcilable differences can be granted, prudence dictates that we not set aside the divorce decree in the present case. Thus, for the instant case, an exception must be made whereby the divorce decree and property judgment are affirmed and the issue of permanent custody is

remanded for rehearing.

### III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO SANCTION JASON LEE FOR TAPPING THE PHONE OF THE MARITAL DOMICILE AFTER BELINDA LEE HAD BEEN GIVEN EXCLUSIVE USE OF THE SAME.

¶37. Belinda alleged and Jason admitted to wiretapping the telephone at the couples marital domicile and recording conversations with his ex-wife as a party. Under Miss. Code Ann. § 41-29-535 (1993), "a person who is a subscriber to a telephone operated by a communication common carrier and who intercepts a communication on a telephone to which he subscribes" is allowed to tap that telephone. Furthermore, *Wright v. Stanley*, 700 So. 2d 174 (Miss. 1997) supports the notion that tapping and recording conversations on one's own phone is a legal undertaking. In the present case, there is no question that Jason is the "subscriber" (his name appeared on the bills) of the phone at the marital domicile. What makes the present situation troubling is that, at least for a portion of the time in question, Belinda had been awarded exclusive use and possession of the marital domicile. In fact, Jason was forced to tap the phone lines outside of the house because he had no right to enter the dwelling. While we feel the recording of private telephone conversations is reprehensible, there is nothing illegal about recording those conversations when the couple was sharing the abode. "[I]t is permissible to record what one could just as easily hear by picking up an extension phone." *Wright*, 700 So. 2d at 279. However, Jason's actions after Belinda was given exclusive use of the house may be actionable, as he was no longer permitted to "pick up an extension phone."

### IV. WHETHER THE PROVISIONS OF MISS. R. APP. P. 28(K) ARE APPLICABLE TO BELINDA LEE'S BRIEF.

¶38. Jason asserts that Belinda's brief in this matter shows contempt and disdain for the trial court and the chancellor in particular. As such, he feels Miss. R. App. P. 28(k) should be invoked; the rule provides, in pertinent part, that "[a]ny brief containing language showing disrespect or contempt for the trial court will be stricken from the files, and the appropriate appellate court will take such further action as it may deem proper." While a reading of Belinda's brief does reveal a definite lack of confidence in the lower court, it does not reach the level of "disrespect or contempt" that would warrant an invocation of Miss. R. App. P. 28(k).

### <u>CONCLUSION</u>

¶39. There are no completely innocent parties in this action for divorce. The actions and attitudes of both parents cast doubts on their true intentions in seeking custody. Their love of their daughter is clearly evident; however, a fair and equitable solution could have been reached without so much venom and spite. Why two obviously intelligent people cannot work out their problems without resorting to using their child as a weapon is beyond logic.

¶40. The attorneys for both parties and the chancellor must shoulder some blame for allowing this case to proceed as it did, resulting in a murky quagmire from which this young girl may never escape. While the factual analysis seems logical and well thought out, the aberrant course this case took defies analysis. Accordingly, we reverse that portion of the judgment dealing with permanent custody of Lauren, and we remand this case to the Pike County Chancery Court for further proceedings on that issue in harmony with

this opinion. In all other respects, the judgment is affirmed.

¶41. **AFFIRMED IN PART AND REVERSED AND REMANDED.**

**PITTMAN, C.J., BANKS, P.J., MILLS AND WALLER , JJ., CONCUR. McRAE, P.J., SMITH AND COBB, JJ., CONCUR IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**