# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01041-COA

**MICHAEL L. ADAMS, JR.**                                                      **APPELLANT**

**v.**

**REBECCA TAYLOR ADAMS**                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/08/2023 |
| TRIAL JUDGE: | HON. RHEA HUDSON SHELDON |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | SAMUEL CHRISTOPHER FARRIS |
| ATTORNEYS FOR APPELLEE: | JOHN S. GRANT IV |
| | BROOKE TRUSTY GRANT |
| | DONALD WAYNE MEDLEY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 01/21/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND WEDDLE, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     After fifteen years of marriage, Michael Adams and Rebecca Adams separated on July 12, 2020.  A month later, Rebecca filed a complaint for divorce in the Lamar County Chancery Court.  During the course of their marriage, they welcomed two children.  Michael and Rebecca agreed to a no-fault divorce, but they each requested physical custody of their children.  After a two-day trial, the chancellor found that it was in the best interest of the children to award sole physical custody to Rebecca.  On appeal, Michael's single issue is that the chancellor abused her discretion when awarding custody to Rebecca.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Six weeks after they met online, Michael Adams and Rebecca Adams married on June 28, 2005, in Hattiesburg, Mississippi. Both Michael and Rebecca had children from previous marriages. Rebecca's children lived with her and Michael in their marital home. Michael and Rebecca also had two children of their own. In early 2007, they welcomed their daughter, A.C., and in the fall of 2015, they welcomed their son, C.A.[1]

¶3. Michael worked as a physician's assistant for Dr. Kurt Kratz for most of his career. He helped Dr. Kratz start Hub Care Pathology (Hub Care) in 1997. Rebecca began working for Dr. Kratz's carrier company, South Mississippi Medical Leasing Company, in January 2006. She later joined Hub Care to assist Michael with "preparing specimens, logging specimens, keeping track with inventory, [and] picking up specimens from clinics and hospitals." In 2015, she transferred to the histology department.[2]

¶4. In 2017, Hub Care was awarded contracts to work with several Merit Hospitals around the State. There were five locations in Jackson. Hub Care needed an office in Jackson to service the clinics there, so Michael was tasked with opening the new office and training its employees. He began commuting every day between the two offices. Eventually, he began staying overnight at hotels in Jackson. During this time, Rebecca was the primary caregiver for the children because Michael spent most of his time in Jackson during the week. Rebecca was responsible for getting the children ready for school, transporting them to and from

---

[1] We use fictitious initials to protect the minors' privacy.

[2] When asked at trial what she did at the histology department, Rebecca explained, "[W]e make and prepare slides for the pathologists to look at, to diagnose cancer. We're responsible for keeping up with the tissue."

school, keeping them involved in extracurricular activities, cooking their meals, helping them prepare for bed, and taking them to doctors' appointments. She also attended church with them on Sundays. She was able to maintain this routine all while working full-time at Hub Care.

¶5. In 2019, Michael asked Rebecca if she and the children would relocate to Jackson with him, but she declined. At trial, she explained, "I had a full-time job, and I had multiple kids that had multiple practices and, you know, school pick-ups, daycare pick-ups. . . . It just wasn't feasible for me to go there." She also explained, "We didn't know if we were going to keep the contract or not. We didn't know how long we would have the contract, if we would even get it when he first moved up there. I didn't feel that it was in the best interest for everybody else to move to Jackson."

¶6. During trial, it was revealed that Rebecca suffered from mental health issues before and during the marriage, with mental health records dating back to 2004. Prior to the marriage, Rebecca was committed to Pine Grove Behavioral Health and Addiction Services (Pine Grove) in Laurel, Mississippi. She testified that her divorce from her ex-husband triggered some of these issues: "I was really anxious and young and didn't know how to process and wanted help processing it all." She explained that she began to have issues again shortly after she and Michael got married. Rebecca detailed several instances when Michael abused her and put her in distressing situations. She testified that early in the marriage, she and Michael constantly argued. She felt like Michael never fully accepted her and her children from her previous marriage. During an argument one day, she expressed to Michael

that she wanted to run herself into a tree so that he wouldn't have to worry about her anymore. Rebecca admitted that she only made the statement "to get a rise out of him to see if he cared about anything." She further stated, "I didn't want to kill myself. . . . [T]hat was the wors[t] statement that I have ever made in my life, and Mike has used it against me for the past 17 years. He wouldn't allow me to do anything. He would not allow me to move pas[t] it or anything." While the statement was unintentional, it alarmed her mother and prompted her to take Rebecca to Alliance Health Center for treatment.

¶7. When Rebecca became pregnant with A.C., Michael encouraged her to get an abortion. Throughout her pregnancy, there were several occasions when they would have arguments, and he would leave her on the side of the road—once even in the rain. She testified that she had to walk to a nearby Sonic and wait several hours before he came back to pick her up. Rebecca also testified that Michael physically assaulted her by pushing her down the stairs at their marital home. Additionally, Michael's psychological evaluation revealed that he admitted to Dr. David Gavel that he once pointed a gun at Rebecca's head after accusing her of having an affair with another man. Despite these instances, Rebecca testified that she was hesitant to leave Michael because he constantly threatened her: "He told me if I file for a divorce, he would take my children from me, and he would take my job from me, and he would take my house from me[.]" She also admitted to Dr. Gavel that she stayed because she wanted to maintain stability for her children.

¶8. During trial, Michael detailed some instances when Rebecca's mental health issues started to become a problem in their marriage. He testified that he was initially unaware of

4

Rebecca's mental health struggles; however, he began to see signs six months into the marriage. He explained that when he finally tried to take her to get help, she tried to jump out of his vehicle while it was moving. Michael testified that "Rebecca would have violent outbursts where she would throw things at the home. She would yell and scream a lot. She nearly ripped the console out of the vehicle that I had. These outbursts were very prevalent at work." Michael testified specifically about an occasion when Rebecca was pregnant with C.A. and had a concerning episode at work:

> When Rebecca was pregnant with [C.A.], I think she was 34 or 35. I don't remember exactly how old she was, but I think her hormones were kicking in pretty strong, but she, in front of a group of people, started literally pulling her hair out of her head, banging her head against the wall, and I believe she threw a pair of scissors across the room, and that episode facilitated the company having to move her from that position with that group of people and putting her into the laboratory where she could be a little more closely monitored. That was a scary thing; that one, because she was very pregnant, and, of course, everyone was concerned for the safety of the baby.

After this incident, Dr. Kratz required her to get therapy before she returned to work. Michael also detailed an occasion where Rebecca had an episode in front of the children:

> [T]here was one time that all the children will remember that were there -- it was bizarre we went to buy a Christmas tree for the house, and Rebecca sat in the middle of the floor in the department store and sobbed uncontrollably while we were shopping for a Christmas tree.

¶9. Rebecca testified that another trigger for her and a source of contention in the marriage came from Michael spending money frivolously and never including her in any financial decisions for the family. She explained, "[W]e were constantly in a fight about something. He was constantly spending money. There was no joint anything. . . . [T]here was no decision making as you would think a marriage would be. I felt like I was living in

5

a house where I wasn't wanted." She also testified that due to Michael's spending habits, she had to save money and accumulate a retirement account to remain secure in case the children had an emergency. It was revealed that Michael had accumulated federal tax debt, but he would never allow Rebecca to see any of their joint tax information that he submitted to his accountant. He also took out several joint loans without explaining the need for the money.

¶10. Rebecca also testified that Michael would often leave for hours without telling her where he was going. She felt that he had become distant and stopped engaging with her and the children. This made her suspicious so she began looking for proof of infidelity. She found that he rented a hotel room in December 2019, and she found several explicit pictures in Michael's email. When asked about the pictures at trial, Michael testified, "I can't really explain why it was on my phone or how they got there." Rebecca also made allegations at trial that Michael was sexually involved with multiple women who worked at Hub Care. He eventually admitted to having an affair with an employee at Hub Care, but maintained that the affair began after he and Rebecca separated on July 12, 2020.

¶11. A month later, Rebecca filed a complaint for a divorce in the Lamar County Chancery Court, citing habitual cruel and inhuman treatment as the ground. She requested temporary child support, spousal support, and custody of the children until a final order was entered. Michael filed an answer and counterclaim for a divorce on October 30, 2020, citing adultery and habitual cruel and inhuman treatment as the grounds. Rebecca answered the counterclaim on November 19, 2020. The chancellor entered a temporary order on

6

December 14, 2020, allowing Michael visitation every other weekend, on Christmas, on Easter, and for half of Spring Break. She ordered Michael to pay the house note, water, power, joint car insurance, half of the children's medical expenses, and $1,500 in child support each month. She ordered Rebecca to pay the cable bill, daycare expenses, and half of the medical expenses.

¶12. On February 2, 2021, the chancellor appointed Cynthia A. Re to serve as the guardian ad litem (GAL) for A.C. and C.A. A hearing was held on May 5, 2021. The chancellor subsequently entered a modified temporary order, allowing Michael visitation every other week during June and July. In the order, the chancellor noted, "The Court understands that the daughter is refusing to visit with the father, however the mother shall make every effort to encourage the daughter to visit with the father." She ordered that the family attend counseling sessions at Connections in Hattiesburg. She also ordered that Rebecca handle all the utility bills that Michael was previously paying. Two weeks later, the chancellor entered another order appointing Amanda Heitmuller as a counselor because Connections informed the parties that they do not handle chancery court matters at their clinic. She authorized the GAL to speak with the counselor as needed. Heitmuller was appointed specifically to help with Michael and A.C.'s relationship. Michael only attended two sessions with A.C. and indicated that the counseling sessions were a "joke," and he "thought it was a waste of time and painful to [his] daughter."

¶13. Michael served Pine Grove with subpoenas to gain access to Rebecca's medical records. After these attempts failed, Michael filed a motion to compel Rebecca to waive her

7

medical privilege. Rebecca filed a motion for a protective order and for a psychological evaluation of Michael. After a hearing on both motions, the chancellor ordered that Rebecca immediately execute medical releases to allow Michael access to the medical records and chancery court files regarding Rebecca's commitment proceedings, including an order and recommendation for psychiatric treatment. The chancellor also ordered that both parties submit to a psychological evaluation by Southern Behavioral Medicine Associates.

¶14. On May 11, 2022, the chancellor entered an order submitting that both parties had voluntarily consented to permit the chancellor to grant the divorce based on irreconcilable differences. The chancellor noted that the issues left to be decided were "equitable distribution of all marital assets/equitable division of the marital debts, . . . custody of the children, child support, health insurance for the children, visitation schedule of the noncustodial parent, tax deduction for the minor children, division of guardian ad litem fees." The following day, the chancellor entered an order resolving those issues, and held the issues regarding custody, visitation, and child support in abeyance until further proceedings. The chancellor also directed that the parties get an additional evaluation by Dr. David Gavel.

¶15. After the parties agreed to an irreconcilable differences divorce, the chancellor granted the divorce on May 12, 2022. On July 19, 2022, Michael filed a motion to modify the temporary order. He requested physical custody of their son based on Rebecca's psychological evaluation and testimony regarding her mental instability. In the motion, Michael noted that "[t]he daughter has been completely alienated from her father and he does not want that to occur with his son." Rebecca filed a response claiming that "[d]espite this

8

court having directed counseling to aid in the repair of the father/daughter relationship, he refused to participate and still wants to put the blame elsewhere."

¶16. Trial took place on May 11, 2022, and July 17, 2023.[3] After the July 2023 trial, the chancellor entered an opinion and final judgment on September 8, 2023. After applying the *Albright* factors,[4] the chancellor found that it would be in the best interest of the children to grant Rebecca sole physical custody of A.C. and C.A. The chancellor accepted the GAL's recommendation regarding physical custody of A.C.; however, the chancellor declined to accept the GAL's recommendation regarding joint physical custody of C.A. The chancellor reasoned:

> [T]he geographical distance between the parties makes shared custody extremely problematic and would place an unnecessary burden on [C.A.] and negatively impact his ability to regularly participate in extra-curricular, school and church activities presently and in the future. Moreover, the [c]ourt finds that joint custody is not advisable due to the inability of Rebecca and Michael to effectively communicate and cooperate in a shared custodial arrangement. Additionally, the [c]ourt has strongly considered the sibling relationship between [A.C.] and [C.A.] and finds that the separation of the siblings would not be in either child's best interest.

The chancellor also set the visitation schedule and ordered that Michael pay $1,666 per month in child support. She ordered that Michael and Rebecca split the expenses for the children's extracurricular activities and their medical expenses. Aggrieved, Michael now appeals.

---

[3] The court entered the divorce judgment on May 12, 2022, but the parties left certain issues like custody and child support for the court to decide at a later date. The court held these issues in abeyance when granting the divorce in 2022.

[4] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

## STANDARD OF REVIEW

¶17. "This Court will not reverse the chancellor's custody decision unless the chancellor abused [her] discretion, was manifestly wrong, or clearly erroneous, or applied an erroneous legal standard." *Smith v. Bellville*, 301 So. 3d 678, 682 (¶8) (Miss. Ct. App. 2020). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004) (quoting *Bower v. Bower*, 758 So. 2d 405, 412 (¶33) (Miss. 2000)).

## DISCUSSION

¶18. "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. To make this determination, chancellors must evaluate the following factors:

> (1) the child's age, health, and sex; (2) the parent with the continuity of care prior to the separation; (3) the parent with the best parenting skills and the willingness and capacity to provide primary child care; (4) the parents' employment and the responsibilities of that employment; (5) the parents' physical and mental health and age; (6) the emotional ties of the parent and child; (7) the parents' moral fitness; (8) the child's home, school, and community record; (9) the child's preference at the age sufficient to express a preference by law; (10) the stability of the parents' home environments and employment; and (11) other factors relevant to the parent-child relationship.

*See id.* "An *Albright* analysis is not a 'mathematical formula.'" *Polk v. Polk*, 332 So. 3d 348, 353 (¶16) (Miss. Ct. App. 2021) (quoting *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001)). "Further, the factors are not meant to be weighed equally in every case." *Id.* All the

10

factors are important, "but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Id*. (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003)). "In order to determine whether or not the chancellor was manifestly wrong [or] clearly erroneous[,] or abused [her] discretion in applying the *Albright* factors, we review the evidence and testimony presented at trial to ensure [her] ruling was supported by the record." *Id*. (quoting *Hollon v. Hollon*, 784 So. 2d 943, 947 (¶13) (Miss. 2001)).

¶19.    Michael contends that the chancellor erred in awarding sole physical custody to Rebecca. He only focused on one factor dealing with the physical and mental health of the parents. Specifically, he asserts that the chancellor ignored the overwhelming evidence of Rebecca's mental instability. He also contends that the chancellor erred by ignoring evidence that Rebecca alienated A.C. After reviewing the relevant factors and evidence that the chancellor relied on, we disagree with Michael's contention.

¶20.    In her opinion and final judgment, the chancellor found that several factors favored Rebecca. The first factor was the continuity of care. The chancellor recognized that Rebecca was the primary caregiver for the children. After Michael relocated to Jackson, Rebecca took on a much more active role in the children's day-to-day activities. She was responsible for picking up and dropping off the children at different schools, she cooked their meals, she took them to all of their doctor appointments, she supported them in their extracurricular activities, and she kept them involved in church. She testified:

> I make sure they have the clothes they need for school. I make sure they have their lunch boxes packed. I make sure they have, you know, everything they need to be successful. I get them to and from school. I make sure that when they need to go to the dentist they go to the dentist. I make sure that they have,

11

you know, appropriate physicals for cheer, et. cetera.  I make sure they have all of their shots.

In the midst of all her parental responsibilities, Rebecca also worked full-time at Hub Care. Michael admitted during trial, "I don't know how Rebecca does it quite honestly.  Getting her back and forth to all the cheer practices.  Getting [C.A.] to baseball.  I don't know how she keeps up with it."  Michael explained that he would drive back to Hattiesburg for doctor appointments and tried to attend some extracurricular activities.  He also explained that he was present in the marital home prior to the separation; however, the chancellor ultimately found that "the majority of the day to day care fell to Rebecca."

¶21.    The chancellor also found that the emotional-ties factor favored Rebecca.  There was much testimony and evidence in the record that Michael's relationship with A.C. had been fractured.  At one point, A.C. expressed a desire to go to counseling with Michael to work through their problems.  The chancellor ultimately appointed a counselor for them and ordered them to attend sessions; however, Michael stopped attending after only two sessions. He testified that the sessions were a "joke because it got absolutely no where."  In the same token, he admitted that he did not seek solutions or express his frustrations to the chancellor about the counseling sessions.  He just simply stopped attending.

¶22.    The chancellor also found that the home, school, and community record of the children favored Rebecca.  There was testimony that A.C. and C.A. enjoyed their schools and performed well.  They also were involved in extracurricular activities.  C.A. was involved in soccer and baseball.  A.C. was involved in cheer and her youth group at their church. They both also frequently attended church with Rebecca on Sundays.

12

¶23. Regarding the physical and mental health of the parents, the chancellor found that this factor favored Michael. She acknowledged that Rebecca has had prior struggles with her mental health in the past but noted that "while Rebecca has a long history of mental health issues[,] there was no evidence that she was a danger to the children or that the children had suffered neglect or abuse due to her mental health." Each time Rebecca spoke about her mental health struggles, she emphasized that she sought help. Based on the chancellor's recommendation in the divorce judgment, Rebecca received a mental evaluation from a psychiatric nurse practitioner at Right Track Medical Group prior to the 2023 trial. After the evaluation, Rebecca would visit the facility monthly. Her visits were eventually reduced to once every three months. Rebecca represented to the chancellor that she had been following the recommendations and treatment plan. She also represented that the nurse practitioner never recommended that she needed psychiatric treatment.[5]

¶24. At the time of the 2023 trial, Rebecca revealed that she was in good health and that she had been under the care of a therapist since January 2020. The chancellor noted that Rebecca "appear[ed] to be doing well as of the date of the trial." The chancellor observed Rebecca's demeanor and found her to be credible when she represented that she was doing well and that she had been consistently seeing a therapist to help manage her mental health. It was proper for the chancellor to make this determination. This Court has held that "[t]he chancellor, by [her] presence in the courtroom, is best equipped to listen to witnesses,

_____

[5] There are several psychiatric reports in the record from periods when Rebecca's mental health issues were prevalent; however, it is important to note that Rebecca had not needed any psychiatric treatment in over eleven years.

observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Mabus v. Mabus*, 890 So. 2d 806, 819 (¶56) (Miss. 2003) (citing *Rogers v. Morin*, 791 So. 2d 815, 826 (Miss. 2001)).

¶25.    There was no testimony or evidence that Rebecca was a bad mother or neglected her children.  Despite her mental health struggles, Rebecca has proved that she is very capable of caring and providing for her children.  Furthermore, Michael presented no evidence indicating that Rebecca's mental condition affected her ability to be an effective parent. Michael even admitted that Rebecca did everything she could to be a good mother to A.C. and C.A.:

> Q. Well -- and then you said you don't know how Rebecca does it, but Rebecca tries to be the best mother she can to [A.C.], doesn't she?
>
> A. That was a compliment, and, yes, I believe she does.
>
> Q. And she tries to do the same thing with [C.A.] too, doesn't she?
>
> A. I believe she does.

If Michael was truly concerned about Rebecca's mental health and how it impacted her ability to be a good parent to their children, it seems contradictory that he would leave Rebecca to handle all the parental responsibilities by herself for years, while he stayed in Jackson.  Dr. Kratz, who testified on behalf of Michael, also admitted that Rebecca was fully devoted to her children:

> Q. But you have had an opportunity while Rebecca was working for you to see her devotion in taking care of the children?
>
> A. Yes.

14

Q. And she has always tried to do everything she could for keeping them at doctor's appointments, keeping them with school appointments, and that sort of thing?

A. Yes.

¶26. Regarding the alienation of A.C., Michael testified that A.C. began visiting him less because she "didn't want to upset her mother by going and doing [things] with me." He also expressed his belief that "[A.C.] had been gaslighted and maybe not overtly told, I don't want you to see your father, but I think you can say that in other ways, and I firmly believe that's occurred." However, Michael never gave any specific instances of Rebecca intentionally alienating A.C., and no evidence in the record confirms that A.C. was alienated. Rebecca represented that she has done nothing to interfere with A.C.'s relationship with Michael and that she has often tried to encourage A.C. to spend time with her father. She explained, "I've encouraged her to go and eat with him, spend time with him, go shopping with him – anything that I can do for them to spend time together." She further explained that she hoped they could resolve their differences because she felt like A.C. needed both parents in her life.

¶27. There is evidence in the record to suggest that A.C. may have been upset with her father regarding his new relationship. At the time of trial, Michael revealed that he was engaged to a woman named Elizabeth and that he lived with her and her daughter in his home in Pearl, Mississippi. He also revealed that he planned to get married after the proceedings were over. Michael testified about an occasion where he had a large Christmas gathering at his home with his new family, and all his children were planning to attend. Rebecca reached out to Michael about trying to make plans and encourage A.C. to attend. She even offered

15

to sit in the driveway of his home to ensure A.C. would feel comfortable being there. When Michael reached out to A.C., he received a short response from A.C. and decided not to further encourage her to attend. When recalling his interactions with A.C., he testified:

> [A.C.] we need to talk about the fact that, you know, I have a new person in my life and a wonderful new family. You would really like these people. I'm not talking to you about that. [A.C.] we need to talk about that. I don't have to talk about that. I'm not going to talk about that, and then just silence.

## CONCLUSION

¶28. All considered, substantial evidence in our record supports the chancellor's findings. After reviewing the evidence and hearing the testimony, the chancellor determined that Rebecca was favored under more *Albright* factors and that it was appropriate to grant her sole physical custody of A.C. and C.A. The factor that she predominately relied on was keeping the siblings together and allowing them to remain rooted in the lives they had already established with Rebecca in Hattiesburg. This Court has held that there is "a preference for keeping siblings together." *Kimbrough v. Kimbrough*, 76 So. 3d 715, 726 (¶64) (Miss. Ct. App. 2011). The chancellor used this preference to arrive at a decision that was in the best interest of the children. She recognized that Rebecca has had some mental health issues; however, the chancellor emphasized that these issues have not negatively impacted the children. Furthermore, no evidence showed that Rebecca alienated A.C. from Michael. "Indeed, we might have interpreted the factors differently than the chancellor. However, our role is to determine whether there was an evidentiary basis to support the chancellor's findings." *Id*. at (¶65). It is "the chancellor [who] has the ultimate discretion to weigh the evidence the way [s]he sees fit." *Johnson*, 859 So. 2d at 1013-14 (¶36). After a review of

16

the record, we find no error in the chancellor's final judgment. There was an evidentiary basis to support her decision, and she articulated sufficient findings in her opinion and final judgment. Thus, the judgment of the Lamar County Chancery Court is affirmed.

¶29. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. ST. PÉ, J., NOT PARTICIPATING.**